UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KYLE GULITZ,

                             Plaintiff,

      v.

ERIC DiBARTOLO, Individually, LINDA McMAHON,
Individually, DONALD CURRY, Individually,
JEFFREY BISCHOFF, Individually, PAUL HOLOPETER,      08 Civ. 2388 (CS)
Individually, LINDA COOPER, Individually and
THE TOWN OF YORKTOWN, NEW YORK,

                         Defendants.
------------------------------------------------------------------X

## MEMORANDUM OF LAW OF DEFENDANTS CURRY AND BISCHOFF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING COMPLAINT

## Table of Authorities

**Case**                                                                                                    **Page**

*Abdu-Brisson v Delta Air Lines*, 239 F3d 456, 465 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 2

*Alfano v Costello*, 294 F3d 365, 374 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*Anderson v Liberty Lobby, Inc.*, 477 US 242, 256 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Aron v Quest Diagnostics, Inc.*,
2005 WL 1541060, *4 (D.N.J. June 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Balletti v Sun-Sentinel Co.*, 909 F. Supp 1539, 1547 (S.D. Fla 1995) . . . . . . . . . . . . . . . . . . . 17

*Bickerstaff v Vassar College*, 196 F3d 435, 452 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 11

*Bolden v PRC*, Inc., 43 F3d 545 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 20

*Brennan v Metropolitan Opera Ass'n*, 192 F3d 310, 318 (2d Cir. 1999) . . . . . . . . . . . . . . . . 11

*Celotex Corp. v Catrett*, 477 US 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Chenette v Kenneth Cole Prods., Inc.*,
2008 WL 3176088 (S.D.N.Y. August 6, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*Cruz v Coach Stores, Inc.*, 202 F3d 560, 570 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Curtis v DiMaio*, 46 F.Supp.2d 206, 213-214 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . 11

*Delaware & Hudson Ry. Co. v Consolidated Rail Corp.*,
902 F2d 174, 177 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*DeSimone v JP Morgan/Chase Bank*,
2004 WL 2978011 (S.D.N.Y. Dec. 22, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Durant v A.C.S. State & Local Sols., Inc.*,
460 F. Supp2d 492, 497-498 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*EEOC v Winning Team, Inc.*, 2009 WL 805127 (W.D.N.C. March 27, 2009) . . . . . . . . . . . . . 17

*Ennis v Sonitrol Mgmt. Corp.*,
2006 WL 177173 at *9 (S.D.N.Y. Jan. 25, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

i

**Case**                                                                                                    **Page**

*Forts v New York City Department of Correction*,
2003 WL 21279439 (S.D.N.Y. June 4, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 14, 20

*Garvin v Potter*, 367 F. Supp2d 548, 564 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Godineaux v LaGuardia Airport Marriott Hotel*,
460 F. Supp2d 413, 421-423 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gregg v NY State Dept of Tax'n & Fin.*,
1999 WL 225534, *12 (S.D.N.Y. Apr. 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v Forklift Systems*, 510 US 17, 21-22 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Heba v New York State Division of Parole*,
537 F. Supp2d 457 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 20

*Hicks v Baltimore Gas*, 829 F.Supp. 791, 796 (D. Md. 1992),
*aff'd*, 998 F2d 1009 (4th Cir. 1993), *cert. den.*, 510 US 1059 (1994),
*reh'g den.*, 511 US 1102 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kamkar v Pitney Bowes Corp.*,
2008 WL 2945974, *3 (D.N.J. July 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kohn v AT&T Corp.*, 58 F. Supp2d 393, 409 (D.N.J. 1999) . . . . . . . . . . . . . . . . . . . . 6

*Lane v Collins & Ailman Floorcoverings, Inc.*,
2001 WL 1338918, *5 (S.D.N.Y. Oct. 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lumpkin v United Recovery Systems, L.P.*,
2009 WL 249407, *6 (N.D. Okla. Feb. 3, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mangrum v Republic Industries, Inc.*,
260 F. Supp2d 1229 (N.D. Ga. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973) . . . . . . . . . . . . . . . . . . . 5

*Milton v Lenox Hill Hospital*, 160 F. Supp2d 687 (S.D.N.Y. 2001) . . . . . . . . . . . . . . 18

*Oncale v Sundowner Offshore Services, Inc.*, 535 US 75, 78-79 (1998) . . . . . . . . . . . . 11

# Table of Authorities, Continued

**Case**                                                                                                    **Page**

*Pesok v Hebrew Union College–Jewish Institute of Religion,*
235 F. Supp2d 281 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

*Phillips v Tilley Fire Equipment Co.,*
1998 WL 808526 (E.D. Pa. Nov. 23, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*R.B. Ventures, Ltd. v Shane*, 112 F3d 54, 57 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Rasco v BT Radianz*, 2009 WL 690986 (S.D.N.Y. March 17, 2009) . . . . . . . . . . . . . . . . . . . 17

*Reed v Shepard*, 939 F2d 484, 491-492 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 16-17, 24

*Reeves v Sanderson Plumbing Products, Inc.*, 530 US 133, 148 (2000) . . . . . . . . . . . . . . . . . . . 3

*Richardson v New York State Department of Correctional Service,*
180 F3d 426, 440 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*St. Mary's Honor Ctr. v Hicks*, 509 US 502, 524 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Sanders v Jefferson County Dept. of Human Resources,*
117 F. Supp2d 1199, 1203 (N.D. Ala. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Schwapp v Town of Avon*, 118 F3d 106, 110 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Scott v Memorial Sloan-Kettering Cancer Center,*
190 F. Supp2d 590, 594 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Sullivan v Newburgh Enlarged Central School Dist.,*
281 F. Supp2d 689 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*Swierkiewicz v Sorema N.A.*, 534 US 506, 510 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Vetter v Farmland Industries, Inc.,*
884 F. Supp 1287 (N.D. Iowa, Central Div. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*White v Fuji Photo Film USA, Inc.,*
434 F. Supp2d 144, 154 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KYLE GULITZ,

                                        Plaintiff,

        v.

ERIC DiBARTOLO, Individually, LINDA McMAHON,
Individually, DONALD CURRY, Individually,
JEFFREY BISCHOFF, Individually, PAUL HOLOPETER,        08 Civ. 2388 (CS)
Individually, LINDA COOPER, Individually and
THE TOWN OF YORKTOWN, NEW YORK,

                                        Defendants.
------------------------------------------------------------------X

## **PRELIMINARY STATEMENT**

This action is brought by the plaintiff, an employee of the Town of Yorktown, alleging that

the defendants created a hostile working environment by making and/or tolerating anti-Semitic

comments on a routine basis. The plaintiff's attempt to use Title VII to impose a code of civility on

the rowdy blue collar working environment of the Highway Department, however, must be rebuffed

for two reasons: first and foremost, the plaintiff is not Jewish and, therefore, not a member of a

protected class; and second, the plaintiff, by engaging in the same bawdy, ribald behavior of which

he now complains, has himself established that he did not consider the working environment of the

Highway Department hostile. Accordingly, the plaintiff's complaint must be dismissed in its entirety.

For the sake of judicial economy, Defendants Curry and Bischoff adopt the facts set forth in

the co-defendants' memorandum of law as if fully set forth herein. Additional facts necessary to the

discussion of the legal issues herein will be set forth separately as needed.

1

# THE BURDEN OF PROOF

"Summary judgment is properly granted where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law'" (*Scott v Memorial Sloan-Kettering Cancer Center*, 190 F. Supp2d 590, 594 [S.D.N.Y. 2002], *quoting*, *R.B. Ventures, Ltd. v Shane*, 112 F3d 54, 57 [2d Cir. 1997]). The moving party will be entitled to judgment as a matter of law where the nonmoving party fails to make a significant showing on an essential element of his case with respect to which he has the burden of proof (*see*, *Pesok v Hebrew Union College–Jewish Institute of Religion*, 235 F. Supp2d 281 [S.D.N.Y. 2002]; *Celotex Corp. v Catrett*, 477 US 317, 322 [1986]).

While a court is required to assess the evidence "in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor" (*Delaware & Hudson Ry. Co. v Consolidated Rail Corp.*, 902 F2d 174, 177 [2d Cir. 1990]), a mere allegation to the effect that an issue of fact exists will not defeat a motion for summary judgment (*see*, *Scott*, *supra*). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial (*see*, *Anderson v Liberty Lobby, Inc.*, 477 US 242, 256 [1986]). "An issue is 'genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" (*see*, *Scott*, *supra* at 594, *quoting*, *Anderson*, *supra* at 248).

It must also be noted that summary judgment is appropriate in discrimination cases, notwithstanding their fact-intensive nature (*see*, *Abdu-Brisson v Delta Air Lines*, 239 F3d 456, 465 [2d Cir. 2001]). In fact, "the Supreme Court has explicitly stated that 'trial courts should not treat discrimination cases differently from other ultimate questions of fact'" (*Scott*, *supra* at 594, *quoting*,

*Reeves v Sanderson Plumbing Products, Inc.*, 530 US 133, 148 [2000]; *St. Mary's Honor Ctr. v Hicks*, 509 US 502, 524 [1993]). "Courts should grant summary judgment where * * * the plaintiff has only created a weak issue of fact and there is abundant evidence of a lack of discrimination" (*Scott*, *supra*, at 594-595, *quoting*, *Reeves*, *supra* at 148).

As set forth below, the complaint must be dismissed in its entirety. First and foremost, the evidence before this Court clearly and convincingly demonstrates that the plaintiff cannot meet his threshold burden in this religious discrimination case: membership in a protected class. As set forth in greater detail in the affidavit of Rabbi Steven Kane, in order to be considered Jewish, a person either needs to have been either[1]: 1) born to a Jewish mother; or 2) born to a Jewish father *and* have been brought up in the Jewish faith with a Jewish education. The plaintiff's claim that he is of "Jewish heritage" notwithstanding, the evidence in this record amply demonstrates not only that the plaintiff has not been brought up in the Jewish faith with a Jewish education, but that he has also failed, as an adult, to remedy those which may otherwise be considered his parents' failings. Specifically, the plaintiff, as neither a child nor as an adult, has: celebrated his Jewish milestones such as Bris and Bar Mitzvah; attended Jewish services at a Temple or Synagogue; observed Jewish holidays; or at all practiced the religion of Judaism. Accordingly, the plaintiff cannot be considered to be an adherent to the religion of Judaism or a follower of the Jewish faith. As Judaism is a religion and not a race, ethnicity or heritage, the plaintiff cannot rely solely on the mere accident of his father's birth to place himself into a protected class where his own conscious actions place him firmly outside.

---

[1]A person can also be considered Jewish if they have converted to Judaism pursuant to its laws and doctrines. Inasmuch as the plaintiff claims to be of "Jewish heritage" and not Jewish by conversion, the criteria for a successful Jewish conversion need not be discussed herein.

*Assuming arguendo*, however, that the plaintiff can circumnavigate this threshold issue, his complaint must nevertheless be dismissed because the working environment of the Highway Department was not subjectively hostile to the plaintiff. The plaintiff also cannot establish that this working environment—where no racial or ethnic group was spared teasing—was particularly hostile to him because of his membership in a protected class. As will be set forth below, chief evidence of this lack of hostility is the plaintiff's own full-fledged participation in the harsh but jovial "ribbing" which routinely occurred at the Highway Department. As the plaintiff can establish neither the subjective hostility of his working environment nor that the hostility was directed specifically at him because of his alleged membership in a protected class, he cannot prevail in this action.

## I. THE PLAINTIFF IS NOT WITHIN THE PROTECTED CLASS

To make out a prima facie case under Title VII, a plaintiff must show: (1) he is a member of a protected class; (2) he is qualified to perform the job in question; (3) there was an adverse employment action; and (4) circumstances supporting an inference of discrimination (*see*, *Swierkiewicz v Sorema N.A.*, 534 US 506, 510 [2002], *citing*, *inter alia*, *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 [1973]). With regard to the first of the above elements, it has been held that since Title VII prohibits only discriminatory workplace behavior, a hostile work environment arises only where the relevant conduct occurred "because of" the plaintiff's membership in a protected class (*Chenette v Kenneth Cole Prods., Inc.*, 2008 WL 3176088 [S.D.N.Y. August 6, 2008]; *White v Fuji Photo Film USA, Inc.*, 434 F. Supp2d 144, 154 [S.D.N.Y. 2006]["Even when a plaintiff establishes that she was exposed to an objectively and subjectively hostile work environment, 'she will not have a claim under Title VII unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class'"]; *Sullivan v Newburgh Enlarged Central School Dist.*, 281 F. Supp2d 689 [S.D.N.Y. 2003]; *see also*, *Alfano v Costello*, 294 F3d 365, 374 [2d Cir. 2002][holding that "it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex"]).

In his complaint, the plaintiff contends that he is in the protected class of those of "Jewish heritage". In doing so, the plaintiff obfuscates the nature of the protected class so that he may also squeeze himself therein. However, the plaintiff's overly broad definition fails to account for one indisputable truth: Judaism is a religion; not a race, heritage or ethnicity. It is axiomatic that those discriminated against on the basis of their Jewish faith and their practice of the Jewish religion are

firmly within a protected class on the basis of that religion (*see e.g.*, *Garvin v Potter*, 367 F. Supp2d 548, 564 [S.D.N.Y. 2005]["the plaintiff alleges, and the defendant does not dispute, that (the plaintiff) was a member of a protected class as a practicing Jew"]; *Pesok v Hebrew Union College–Jewish Institute of Religion*, 235 F. Supp2d 281, 285 [S.D.N.Y. 2002]["As a Jew, (the plaintiff) is a member of a protected class on the basis of his religion"]; *Kamkar v Pitney Bowes Corp.*, 2008 WL 2945974, *3 [D.N.J. July 29, 2008]["as a member of the Jewish Faith, (the plaintiff) falls within a protected class"]; *Aron v Quest Diagnostics, Inc.*, 2005 WL 1541060, *4 [D.N.J. June 30, 2005]["there is no dispute that plaintiff, who is an Orthodox-observant Jew, is a member of a protected class"]; *Sanders v Jefferson County Dept. of Human Resources*, 117 F. Supp2d 1199, 1203 [N.D. Ala. 1999][the plaintiff was a member of a protected class because he was a "loyal and firmly committed believer in and adherent to the religion of Judaism"]; *Kohn v AT&T Corp.*, 58 F. Supp2d 393, 409 [D.N.J. 1999]["the defendants do not contest (the plaintiff), as a member of the Jewish faith, is part of a 'protected class'"]; *Vetter v Farmland Industries, Inc.*, 884 F. Supp 1287 [N.D. Iowa, Central Div. 1995]["there is no significant dispute that (the plaintiff) was a member of a protected class on the basis of his adherence to the Jewish faith"]). Each and every one of the foregoing cases find the plaintiff within the protected class on the basis of their respective adherence to the Jewish faith—not the mere claim of a Jewish "heritage" made by someone who has not practiced, and has actually eschewed (Plaintiff's EBT at p. 32, l. 14-16; p. 33, l. 3-10; Samuels Aff. at ¶ 14; Michaud Aff. at ¶ 3-5), the religion of Judaism.

As set forth in greater detail in the accompanying affidavit of Rabbi Steven Kane, Judaism is a religion, not a race, ethnicity or heritage (Kane Aff. at ¶ 2). A statement that someone is "Jewish" is a statement that the person is a believer in, and an adherent to the religion of Judaism; it is not a

statement of someone's race, heritage or ethnicity (Kane Aff. at ¶ 3). Accordingly, a person is free to convert to Judaism in accordance with Jewish law, and upon such conversion will be considered a Jew the same as any other believer in Judaism (Kane Aff. at ¶ 3). Such is not the case with someone's race, heritage or ethnicity, which are intrinsic from birth and will not change regardless of whether that person subsequently changes his or her citizenship (Kane Aff. at ¶ 3). In that regard, there are Jews who are Asian, African, Latin American, Caucasian and of many other ethnicities and races (Kane Aff. at ¶ 3). One famous example of this principle in action is the conversion of singer/entertainer Sammy Davis, Jr. to Judaism. Notwithstanding his conversion to the religion of Judaism, Mr. Davis retained his African race and his African-American heritage and, in fact, continued to champion the cause of African-American civil rights movement while practicing the religion of Judaism.

Turning to the plaintiff's contention that he is a member of the protected class, there are three major branches of Judaism: Orthodox, Conservative and Reform (Kane Aff. at ¶ 4). All three branches of Judaism agree on the following point: a person is considered Jewish if both parents are Jewish, or if they have converted to Judaism (Kane Aff. at ¶ 5). All three branches also consider someone as Jewish if their mother was Jewish (Kane Aff. at ¶ 5). Inasmuch as the plaintiff's mother is not Jewish but, rather, Presbyterian (Plaintiff's EBT at p. 29, l. 17-19), the plaintiff cannot be considered Jewish under the doctrines of the Orthodox or Conservative branches of Judaism (Kane Aff. at ¶ 7).

With regard to the Reform branch of Judaism, it permits a person with a Jewish father and a non-Jewish mother to be considered Jewish *provided, however, that the person has been brought up in the Jewish faith and has received a Jewish education* (Kane Aff. at ¶ 8). The evidence in this

record is clear that: the plaintiff was not circumcised in the Jewish ceremony of a Bris (Plaintiff's EBT at p. 227, l. 9-13); the plaintiff believes that the officiant at a Bris is a Mullah—an Islamic clergyman—and not a Mohel (Plaintiff's EBT at p. 30, l. 12-16); the plaintiff has not been Bar Mitzvahed (Plaintiff's EBT at p.30, l. 21-23, p. 31, l. 7-8); the plaintiff does not observe religious Jewish holidays and does not take off from work on any such holidays (Plaintiff's EBT at p. 31, l. 9-22); the plaintiff only had a Hanukkah Menorah in his home "when his grandmother was around" (Plaintiff's EBT at p. 30, l. 5-6); the plaintiff is not a member of a Temple or Synagogue and does not attend Jewish services (Plaintiff's EBT at p. 31, l. 23-24, p. 32, l. 1-4); and the plaintiff does not now, and has never practiced the religion of Judaism (Plaintiff's EBT at p. 29, l. 7-10, p. 226, l. 19-22, p. 227, l. 3-8; p. 73, l. 13-16). As set forth below, these failures lead to the inescapable conclusion that the plaintiff is not an adherent to the Jewish faith and, accordingly, by his own conscious inactions is firmly outside the protected class.

Of all of the plaintiff's above failures, his failure to celebrate his Bris and Bar Mitzvah are most significant in establishing that the plaintiff is not of the Jewish faith (Kane Aff. at ¶ 10). The Bris is a religious ceremony performed by a Mohel on the eighth day after a male is born whereby a portion of the foreskin is removed (Kane Aff. at ¶ 10). A Bris is performed to welcome that individual into the Jewish faith (Kane Aff. at ¶ 10). The ritual circumcision is referenced in the Book of Genesis when Abraham performed a Bris upon himself to show his Covenant with God (Kane Aff. at ¶ 10). Because the Bris is the demonstration of the Jewish Covenant with God, a male who has not gone through such a ceremony is a clear indication that he is not of the Jewish faith (Kane Aff. at ¶ 10).

8

The Bar Mitzvah is a similarly significant milestone. The Bar Mitzvah occurs shortly after the Jewish male's thirteenth birthday (Kane Aff. at ¶ 11). At Bar Mitzvah, the Jewish adolescent male is welcomed as an adult into the Jewish faith, and upon becoming Bar Mitzvah, the male is considered an adult member of the Jewish community (Kane Aff. at ¶ 11). The Bar Mitzvah is an important development in the life of a Jewish male because as an adult member of the Jewish community, the male is permitted to counted as a member of a minyan (prayer quorum), is obligated to fast on Yom Kippur (the Jewish day of Atonement), and is obligated on all aspects of Jewish law and tradition (Kane Aff. at ¶ 11). A Bar Mitzvah ceremony is held as an indication that the person has achieved not only the age of 13, but also has received a formal Jewish education up to that point (Kane Aff. at ¶ 11).

The plaintiff's failures to comply with the obligations of the Bris (making his Covenant with God) and progress into an adult role in the Jewish community (his Bar Mitzvah) are clear and convincing evidence that the plaintiff was not brought up in the Jewish faith (Kane Aff. at ¶ 12). The plaintiff's failure to observe basic requirements of the Jewish religion such as observing its High Holy days of Rosh HaShanah and Yom Kippur, and failing to observe other major Jewish holidays such as Passover is further evidence that the plaintiff is not a follower of the Jewish faith or adherent to the Jewish religion (Kane Aff. at ¶ 12). Accordingly, as the plaintiff cannot be considered to be Jewish under the doctrines of any of the branches of Judaism (Kane Aff. at ¶ 12), he is firmly outside of the protected class and his complaint must fail.

## II.   THE PLAINTIFF'S WORK ENVIRONMENT WAS NOT HOSTILE

A Title VII plaintiff claiming hostile work environment discrimination based on co-worker conduct must establish that: 1) the workplace was "permeated with discriminatory intimidation" that was so severe and pervasive that it altered the work environment for the worse; and 2) the conduct which gave rise to the hostile environment had a "specific basis" for being linked to the employer (*see*, *Cruz v Coach Stores, Inc.*, 202 F3d 560, 570 [2d Cir. 2000]; *Schwapp v Town of Avon*, 118 F3d 106, 110 [2d Cir. 1997]; *Forts v New York City Department of Correction*, 2003 WL 21279439 [S.D.N.Y. June 4, 2003]). The standard for assessing a hostile work environment claim is both objective and subjective: the alleged victim must perceive the environment to be hostile or abusive, and the conduct must be so severe or pervasive that a reasonable person would find the environment hostile or abusive (*see*, *Harris v Forklift Systems*, 510 US 17, 21-22 [1993]). "To withstand summary judgment, a 'plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'. . . In the end, '[d]etermining whether workplace harassment was severe or pervasive enough to be actionable depends upon the totality of the circumstances" (*Forts v New York City Department of Correction*, *supra*, at *4, *quoting*, *Whidbee v Garzarelli Food Specialties, Inc.*, 223 F3d 62, 69 [2d Cir. 2000]). The plaintiff must also demonstrate that the hostile work environment complained of arises from hostility based on the plaintiff's membership in a protected class (*Alfano v Costello*, 294 F3d 365 [2d Cir. 2002]; *Chenette v Kenneth Cole Prods., Inc.*, 2008 WL 3176088 [S.D.N.Y. August 6, 2008]; *Forts v New York City Department of Correction*, *supra*).

It is crucial to note that "Title VII is not a general civility code" (*White v Fuji Photo Film USA, Inc.*, 434 F. Supp2d 144, 154 [S.D.N.Y. 2006], *citing, Oncale v Sundowner Offshore Services, Inc.*, 535 US 75, 78-79 [1998]; *see, Bickerstaff v Vassar College*, 196 F3d 435, 452 [2d Cir. 1999]). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency" (*White v Fuji Photo, supra*, at 154-155, *quoting, Ennis v Sonitrol Mgmt. Corp.*, 2006 WL 177173 at *9 [S.D.N.Y. Jan. 25, 2006]; *see, Curtis v DiMaio*, 46 F.Supp.2d 206, 213-214 [E.D.N.Y. 1999]). In that regard, an environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes (*see, Brennan v Metropolitan Opera Ass'n*, 192 F3d 310, 318 [2d Cir. 1999]; *Richardson v New York State Department of Correctional Service*, 180 F3d 426, 440 [2d Cir. 1999]; *Forts v New York City Department of Correction, supra*; *Sullivan v Newburgh Enlarged Central School Dist., supra*; *White v Fuji Photo Film USA, Inc.*; *Heba v New York State Division of Parole*, 537 F. Supp2d 457 [E.D.N.Y. 2007]).

With regard to the issue of the work environment which is equally harsh or is motivated by personal animosity, several cases are particularly instructive. The first is *Heba v New York State Division of Parole* (537 F. Supp2d 457 [E.D.N.Y. 2007]). In *Heba*, the plaintiff was a naturalized American who was born in Egypt and practiced the Muslim faith (*Id.* at 459). During his employ, the plaintiff was assigned to work with an officer Zwaryczuk, and the two developed a "very close" relationship (*Id.* at 460). However, Zwaryczuk "hat[ed] Jews generally and ma[de] anti-Semitic comments[], as well as derogatory and racist comments against African-Americans and Hispanics" (*Id.* at 460).

Subsequently, the two came to be employed in a special unit in a supervisor-subordinate relationship with Zwaryczuk as the supervisor, and Heba as the subordinate (*Id.* at 460). The relationship between the two "very close" individuals deteriorated, and Zwaryczuk became verbally abusive (*Id.* at 460). At around the same time, when the plaintiff requested an overtime assignment, Zwaryczuk declined the plaintiff's request and commented that the plaintiff was a "camel jockey" (*Id.* at 461). Shortly thereafter, that plaintiff found an article on his desk entitled "Proud to be an Egyptian" describing and depicting a scene with three holy men. The plaintiff's picture was superimposed over one of the holy men and the plaintiff's name was written in the place of one of the depicted individuals (*Id.* at 461-462). Several months later, another picture was placed on the plaintiff's desk, this one depicting a man riding a camel (with Zwaryczuk's picture superimposed on the depicted person) with the caption "John Zwaryczuk, Taliban" (*Id.* at 462).

After the photograph incidents, Zwaryczuk made several other anti-Arab statements, including one statement made when the plaintiff approached stating that he "smelled a camel behind him" (*Id.* at 462), calling that plaintiff a "fucking Arab" (*Id.* at 462) and telling the plaintiff that "I'm coming to the office especially to fuck you up, you fucking Arab" (*Id.* at 463). During the course of the above, Zwaryczuk placed a counseling memorandum in the plaintiff's file regarding an alleged incident of insubordination (*Id.* at 463-464), contacted the FBI to advise it that he wanted to change his earlier positive recommendation of the plaintiff for a position therewith (*Id.* at 464), and had the plaintiff assigned out of his unit (*Id.* at 464).

Upon his reassignment, the plaintiff found himself working in a unit where he would find on his desk articles about anti-Semitism and anti-Zionism, which the plaintiff took as a clear implication that he was supposed to be prejudiced against Jewish people because of this Arab nationality (*Id.* at

12

464). The plaintiff also, upon showing pictures of his camera-shy child, was the recipient of comments to the effect that his child did not want his picture to be found in a suspect photo array (*Id.* at 464-465).

Notwithstanding all of the foregoing, upon a defense motion for summary judgment, the court granted the motion, finding that:

> Zwaryczuk's alleged invectives are, without question, insulting and offensive. However, given the context of their relationship and, furthermore, the context of the arguments, the comments are more reflective of the growing antagonism between former friends, rather than discriminatory animus. Zwaryczuk's angry outbursts, while inappropriate, simply do not constitute an environment of pervasive hostility and abuse directed toward Plaintiff because of his race or national origin (*Heba*, *supra*, at 468).

Another case in which a plaintiff attempted to turn Title VII into a civility code, *Forts v New York City Department of Correction* (2003 WL 21279439 [S.D.N.Y. June 4, 2003]) is also instructive. In *Forts*, that plaintiff, an African-American female, was: asked by a male correction officer whether she had sex in the backseat of a car (*Id.* at *1); pricked with a sharp object by a fellow correction officer (*Id.* at *1); rebuffed by her supervisors when she attempted to report the foregoing incidents (*Id.* at *2); had a male correction officer offer to feed her birthday cake while licking his lips and stating "sit down and let me feed you" (*Id.* at *2); subjected to two "random" drug tests in a 60 day period (*Id.* at *2); subjected to comments of another fellow correction officer that one of his favorite parts of the movie *Amistad* was "[t]he way they got rid of excess cargo by chaining the slaves to an anchor and then throwing them overboard", and that "[b]lack people in Africa were uncivilized and slavery kept them from killing each other" (*Id.* at *3); pushed on the shoulder by a co-worker after the *Amistad* incident (*Id.* at *3); and found a poster on her locker room

door advertising the sale of sex toys depicting a man in chains and a woman standing next to him (*Id.* at *3).

Notwithstanding all of the foregoing, upon a defense motion for summary judgment, the court granted the motion. In doing so, the court specifically found that:

> Considering the totality of the circumstances presented, ***the proffered facts do not indicate that the DOC officers' conduct could reasonably be viewed as having altered Plaintiff's work environment for the worse***. * * * Plaintiff has cited isolated incidents that do not meet the "severe and pervasive" standard of a race and/or sex-based hostile work environment claim. ***Viewed as a whole, the evidence lacks objective indicators of sexual or racial basis, severity, and pervasiveness; it is thus insufficient to sustain Plaintiff's claim.***
>
> ***Although the incidents alleged by Plaintiff may have made her feel uncomfortable, they do not objectively indicate that the work environment was sexually or racially discriminatory.*** The record indicates that Officer Marino's "sex in all positions" comment was made to a group of both men and women. * * * Additionally, the bondage poster showing both men and women, found on the ladies' locker room door and other doors in publicly-accessible areas of the SIC, in February 1999, is not directed to any protected class. ***Plaintiff was not the only employee targeted by this incident. It is undisputed that the poster was found in areas where both men and women work, and showed both men and women in a demeaning situation. There is no objective indication of any anti-female bias in this incident*** (emphasis supplied) (*Forts, supra,* at *5-6).

A third case wherein the Court rebuffed an attempt to turn Title VII into a civility code is *Bolden v PRC, Inc.* (43 F3d 545 [10th Cir. 1994]). In *Bolden*, that plaintiff, an African-American, was subjected to: a comment that "you better be careful because we know people in [the] Ku Klux Klan" (*Id.* at 549); uses of the words "honky" and "nigger", although it was conceded that these terms were not exclusively directed at African-American employees (*Id.* at 549); a hand-drawn cartoon directed at the plaintiff as the only African-American in the shop (*Id.* at 549); having a co-worker expel flatus onto him stating that it was "a kiss for you"(*Id.* at 549); being called a "dickhead", a "dumb shit", an "asshole", a "faggot", and a "fool" (*Id.* at 549); a co-worker's tampering with his chair so that it

would fall apart when the plaintiff sat down (*Id.* at 549); being told to go to hell with his family (*Id.* at 549); and an incident where a co-worker bumped him violently (*Id.* at 549). In this particular shop, "most of the workers made jokes and were the targets of joking behavior" (*Id.* at 549). In affirming the District Court's granting of a defense motion for summary judgment, the Court of Appeals found that the workplace was harsh for all, specifically noting that:

> "Many of the workers harassed one another; many of the workers were the recipients of such jokes. ***The derisive environment in the workshop was universal; [the plaintiff] was not singled out for abuse.*** [The plaintiff] notes for the court, ***others in the shop were badgered as he was.*** The only difference, revealed in the record, between [the plaintiff] and the rest of the shop was that [the plaintiff] could not tolerate the taunting. [the plaintiff] did not share the crude and rude sensibilities of his coworkers.
>
> * * *
>
> ***[The plaintiff's] workplace was permeated with "intimidation, ridicule, and insult"; however, the record reveals the intimidation, ridicule, and insult were directed indiscriminately, not targeted at [the plaintiff] due to his race.*** Thus, we conclude [the plaintiff's] claim of racial harassment fails because he has not shown he was singled out for abuse and has not shown the ridicule he faced stemmed from racial animus" (emphasis supplied) (*Bolden, supra*, at 551).

(*see also, Durant v A.C.S. State & Local Sols., Inc.*, 460 F. Supp2d 492, 497-498 [S.D.N.Y. 2006][granting summary judgment in defendant's favor and holding that offensive jokes, a comment by a supervisor regarding her sex life, and two requests for sex did not rise to the level of a hostile work environment]; *Godineaux v LaGuardia Airport Marriott Hotel*, 460 F. Supp2d 413, 421-423 [E.D.N.Y. 2006][granting summary judgment in defendant's favor and holding that repeated "hissing" at plaintiff, stray anatomy-related comments, stray sexually suggestive comments and gestures, one request for sex, and one attempt at a kiss did not rise to the level of a hostile work environment]; *DeSimone v JP Morgan/Chase Bank*, 2004 WL 2978011 [S.D.N.Y. Dec. 22,

2004][asking plaintiff out repeatedly despite her rejections, frequently using the word "fuck" when speaking to her, leering and staring at her body during office encounters, referring to female co-workers as "eye-candy," stating that female co-worker kept her job only because she was dating a senior-level employee, stating that another co-worker had slept her way to the top, suggesting that a female employee needed sex, and stating that he wanted to swap his wife with another employee's girlfriend did not constitute a hostile working environment]; *Gregg v NY State Dept of Tax'n & Fin.*, 1999 WL 225534, *12 [S.D.N.Y. Apr. 19, 1999][ten to fifteen allegedly inappropriate conversations, four instances of allegedly offensive touching, and repeated invitations to meals, drinks, and such over three to four months were not "sufficiently severe or pervasive" to constitute hostile working environment]; *Lane v Collins & Ailman Floorcoverings, Inc.*, 2001 WL 1338918, *5 [S.D.N.Y. Oct. 31, 2001][comments made: during a meeting where one employee, while pointing to someone wearing a bright colored shirt, said to a second employee "what would they say about you if you walked in with that shirt in Alabama?" to which the second employee responded "they'd be sweet on me"; at the same meeting where one employee made a comment to the effect that if he "stuck his tush out with the designers, that would be one way to get the business"; at another meeting, while sitting at the bar/lounge area, an employee told the plaintiff that "the way to the [Associated Designer] community's heart was to screw the little ladies and let the fags fuck you in the ass"; and upon learning that one employee lent some clothes to her (gay) friends for a Halloween costume, another employee asked "what do you do when you get the clothes back, you make sure you wash everything in Clorox?" found not to constitute a hostile working environment]).

In a similar vein, it has been found that where the plaintiff is complicit in the promotion of the allegedly hostile work environment, it cannot be considered subjectively hostile to him (*see, Reed*

16

*v Shepard*, 939 F2d 484, 491-492 [7[th] Cir. 1991][plaintiff could not argue that work environment was hostile where she instigated and participated in sexual horseplay and had "one of the foulest mouths" in the department]; *Rasco v BT Radianz*, 2009 WL 690986 [S.D.N.Y. March 17, 2009][finding that plaintiff's participation in the allegedly hostile actions undermines a claim of subjective hostility]; *Lumpkin v United Recovery Systems, L.P.*, 2009 WL 249407, *6 [N.D. Okla. Feb. 3, 2009]["the court is unpersuaded that, with respect to at least some of the behavior, plaintiff subjectively found it to be hostile or abusive, as evidenced by the fact that plaintiff actively engaged in similar behavior himself, particularly with his co-worker"]; *Mangrum v Republic Industries, Inc.*, 260 F. Supp2d 1229 [N.D. Ga. 2003][plaintiff's participation in inappropriate activity establishes that such was not subjectively hostile]; *Balletti v Sun-Sentinel Co.*, 909 F. Supp 1539, 1547 [S.D. Fla 1995]["Furthermore, the court may consider whether the plaintiff participated in the very conduct of which she complains. Where a plaintiff's action in the work place shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the conduct was "unwelcome" or "hostile"]; *Hicks v Baltimore Gas*, 829 F.Supp. 791, 796 [D. Md. 1992], *aff'd*, 998 F2d 1009 [4[th] Cir. 1993], *cert. den.*, 510 US 1059 [1994], *reh'g den.*, 511 US 1102 [1994][plaintiff could not make out case of sexual harassment even though male co-workers called her names, sexually-oriented cartoons were posted on bulletin board, and one cartoon contained derogatory comments with her name; she admitted calling co-workers names, she subjected co-workers to offensive language, and her own behavior was erratic and angry]; *see also*, *EEOC v Winning Team, Inc.*, 2009 WL 805127 [W.D.N.C. March 27, 2009][plaintiff not entitled to new trial where jury rendered defense verdict after considering the alleged victim's personal participation in the purportedly hostile events]; *Phillips v Tilley Fire Equipment Co.*, 1998 WL 808526 [E.D. Pa. Nov.

23, 1998][plaintiff not entitled to jury instruction prohibiting jury consideration of plaintiff's own use of racial namecalling]). Subjective hostility will also be negated where a plaintiff has remained friends with his alleged tormentor after the occurrence of the behavior at issue (*see*, *Milton v Lenox Hill Hospital*, 160 F. Supp2d 687 [S.D.N.Y. 2001]).

The working environment of the Yorktown Highway Department is precisely the type of rowdy, bawdy, equally harsh workplace described in the above jurisprudence, where off color remarks are thrown around indiscriminately—including by the plaintiff himself. The rowdiness of the Highway Department owes to its blue collar nature. At the Highway Department, employees regularly joke and "bust on each other" in a fashion which can be "pretty rowdy" on subjects ranging from physical characteristics to ethnicity. The juvenile atmosphere of the Highway Department has been likened to that of a fraternity house (Mills' EBT at p. 8, l. 15-18; p. 57, l. 25, p. 58, l. 2-7; Michaud Aff. at ¶ 2, 8; Curry Aff. at ¶ 2, 3). Comments which may be perceived by those outside the Highway Department as unsavory, including statements directed at race, religion, national origin, ethnicity, etc. "came up in everyday conversation" and were made while employees were "joking around like everyone else"; however, no animus or hostility was intended by these jokes (Mills' EBT at p. 33, l. 23-25, p. 34, l. 1-2; Granata EBT at p. 51, l. 9-24; Shields EBT at p. 25, l. 19-25, p. 26, l. 2-4; Molinari EBT at p. 25, l. 5-25l p. 29, l. 25, p. 30, l. 2-15; Michaud Aff. at ¶ 2; Curry Aff. at ¶ 2, 3). For example, heterosexual workers will nonetheless be greeted as a "fag," "homo," or "queer" as a way of saying "good morning", and a bald supervisor is referred to as "shiny" and "the drainage Nazi" (Mills EBT at p.60; Plaintiff's EBT at p. 88). Seemingly anti-Semitic comments such as "cheap as a Jew" and "don't Jew me on the price" were routinely made at the Highway Department, but were used "whether you're Jewish or not, doesn't seem to matter" (Mills EBT at

p. 9, l. 5-25). The word "nigger" was used "almost every day" at the Highway Department, but it was not used as an anti-African American slur because "you don't have to be black to be a nigger. Slow, uncouth, uneducated. Stuff like that" (Mills EBT at p. 13, l. 6-21; p. 58, l. 19-23). With regard to those who are the target of the epithets around the Highway Department, no group has been spared (Mills' EBT at p. 64, l. 23-25; Shields EBT at p. 31, l. 23-25, p. 32, p. 33 l. 2-9; p. 57, l. 24-25, p. 58, l. 2-11).

The ribald joking around the highway department also took the form of cartoons that were circulated around the Highway Department (Exhibit F; Curry Aff. at ¶ 9, 10, 20). Amongst the cartoons circulated were cartoons ribbing Tommy Quasi for driving with a bumper sticker reading "I'm go gay" (Exhibit F-1; Mills EBT at p. 77, l. 16-25, p. 78, l. 2-9); ribbing Tommy McNulty for being cheap (Exhibit F-2; Mills EBT at p. 78, l. 18-25, p. 79, l. 2-8; Curry Aff. at ¶ 15); ribbing defendant Curry for his physically deformed abdomen (Exhibit F-3; Mills EBT at p. 80, l. 9-25, p. 81, l. 2; Curry Aff. at ¶ 12); ribbing an employee's brother for having committed suicide (Exhibit F-5; Mills EBT at p. 84, l. 5-15); ribbing Eric Miller for his bad luck while fishing (Exhibits F-6 & F-9; Mills EBT at p. 84, l. 19-25, p. 85, l. 2-10; p. 87, l. 5-14); ribbing J. John Michaud for his love of food (Exhibit F-7; Mills EBT at p. 85, l. 17-24); ribbing Charlie Vilarino and Dave Daugherty as the Hanna-Barbera characters Yogi Bear and Boo-Boo (Exhibit F-8; Mills EBT at p. 86, l. 12-17); ribbing Dave Nicashire's attempt to get a new truck (Exhibit F-10; Mills EBT at p. 87, l. 21-25, p. 88, l. 2); ribbing Scott Mills as a "goat fucker" (Exhibit F-11; Mills EBT at p. 88, l. 22-25, p. 89, l. 2-10); ribbing the plaintiff as Curious George (Exhibit F-12; Mills EBT at p. 90, l. 10-19); ribbing Pete Androsco for talking someone to death (Exhibit F-13; Mills EBT at p. 91, l. 7-21); ribbing Scott Mills for his sleight weight (Exhibit F-14; Mills EBT at p. 92, l. 15-25; p. 93 l. 17-25, p. 94 l. 2-4;

Curry Aff. at ¶ 11); ribbing Brad Shepard (Exhibit F-17; Mills EBT at p. 95. l. 5-12); ribbing the plaintiff for filing a phony worker's compensation for a horse playing injury (Exhibit F-19; Curry Aff. at ¶¶ 16-19); and ribbing J. John Michaud for failing his CDL test (Exhibits A & B to Exhibits J & K [defendants's request for admission and plaintiff's verified response]; Mills EBT at p. 98, l. 4-25, p. 99, l. 2-10; Michaud Aff. at ¶ 16-17, Exhibit A). These cartoons were just a part of the ribbing and joking which occurs at the Highway Department (Shields EBT at p. 69, l. 7-23).

The above facts place this matter squarely on all fours with *Heba v State of New York*, *Forts v New York City Department of Correction*, and *Bolden v PRC, Inc.*, *supra*. In all three of those cases, as here, the invectives were not directed at any one particular person because of a membership in a protected class but, rather, were either targeted indiscriminately (*Forts, Bolden*) or were targeted at an individual based on a pre-existing relationship (*Heba*). The crucial element of singling Mr. Gulitz out based upon his recently professed Jewish heritage is completely absent. The plaintiff was just one of the many individuals who were the subject of harsh ribbing—along with Messrs. Michaud, Curtis, Alimonte, Androsco, Gage, Ireland, Mills, Quasi, McNulty, Miller, Vilarino, Daughtery, Nicashire, Shepard and Molinari and defendants Curry, Bischoff, DiBartolo, Hollopeter and McMahon. Given the wide variety of invectives delivered at the Highway Department, and the equally wide spectrum of "victims" of these invectives, it is clear that the plaintiff cannot meet his burden to demonstrate that he was singled out for hostile treatment, and such hostile treatment was made solely because of his recently professed Jewish heritage.

Further evidence that the plaintiff was not singled out based upon his recently professed Jewish heritage, and that the plaintiff did not consider the ribbing hostile (at least prior to thinking that he can cash in on the behavior) is the fact that he was friends with his alleged tormentor,

defendant Curry. The relationship between the two was sufficiently close that the two had exchanged emails and jokes back and forth (Plaintiff's EBT at p. 50, l. 22-24, p. 56, l. 8-13, l. 10-16; Mills EBT at p. 70, l. 2-7; Shields EBT at p. 65, l. 18-25, p. 66, l. 2-4; Curry Aff. at ¶ 4, 16, 19, 25, 26). During the course of their friendship, the plaintiff and defendant Curry would joke around with each other and rib each other back and forth, but such ribbings were not intended to be hurtful (Plaintiff's EBT at p. 51, l. 8-10; Mills EBT at p. 70, l. 2-25, p. 71, l. 4-10; Granata EBT at p. 42, l. 5-19; Shields EBT at p. 66, l. 5-7; Curry Aff. at ¶ 3, 4, 16, 19, 25, 26). For example, the plaintiff would mock defendant Curry for being bald (Plaintiff's EBT at p.87-88; Curry Aff. at ¶ 21) and for having a deformed abdomen (Mills EBT at p. 66; Curry Aff. at ¶ 12, 21) by calling him a "bald headed Irishman" and "Quatto" (Curry Aff. at ¶ 12, 21). While the plaintiff would direct his ribbing at defendant Curry's physical characteristics, defendant Curry would rib the plaintiff by calling him Jewish—even though defendant Curry was unsure of the plaintiff's religion—because he knew that the best way to "needle" the plaintiff was to falsely accuse him of being Jewish (Curry Aff. at ¶ 16). The plaintiff remained friends with defendant Curry despite believing that defendant Curry had attended a meeting of the Ku Klux Klan (Plaintiff's EBT at p. 83, l. 10-24), and the plaintiff and defendant Curry would have lunch together, even after defendant Curry was allegedly made aware that the plaintiff was "Jewish" (Plaintiff's EBT at p. 59, l. 7-17).

While such a friendship may seem out of the ordinary for a person of reasonable sensibilities, it was hardly out of the ordinary for the plaintiff. Specifically, the plaintiff's childhood friend, Matthew Arruda, would similarly call the plaintiff a Jew and a "kike" to get under the plaintiff's skin  (Plaintiff's EBT at p. 35, l. 11-22; p. 75, l. 2-22). In response to Mr. Arruda's calling the plaintiff a Kike, the plaintiff publicly used the racial slur "guinea" to rib his friend in return

(Plaintiff's EBT at p. 74, l.25, p. 75, l. 1-3). Notwithstanding Mr. Arruda's anti-Semitic comments, the plaintiff remained friends with him (Plaintiff's EBT at p. 75, l. 8-22). Just as Mr. Arruda's comments to and from the plaintiff were playful banter and, accordingly, not hostile, so were defendant Curry's.

Finally, regardless of the plaintiff's admitted friendship with such individuals, conclusive evidence that the plaintiff did not find the ribald ribbing at the Highway Department subjectively hostile was the plaintiff's own participation therein on subjects such as race, sexual orientation, intelligence, appearance, physical characteristics, and other intrinsic factors (Michaud Aff. at ¶ 2, 8; Curry Aff. at ¶ 3). When ribbed with racially charged comments, the plaintiff will respond in kind; stated differently, the plaintiff gives as good as he gets (Plaintiff's EBT at p. 72, l. 13-15, Mills EBT at p. 67, l. 13-19; p. 71, l. 11-14; Curry Aff. at ¶ 2, 3, 4). In "giving as good as he gets", the plaintiff has: used the racial slurs "spic"(Plaintiff's EBT at p. 72, l. 16-21, p. 76, l. 16-21), "guinea", "dago", "wop" and "greaseball" around the shop, including in reference to defendant DiBartolo; stated that "you have to be a guinea to get ahead around here" (Plaintiff's EBT at p. 74, l. 18-23; p. 76, l. 16-21; Mills EBT at p. 61, l. 4-5, l. 13-18; Michaud Aff. at ¶ 13; Curry Aff. at ¶ 21); used sexist language on an "almost daily" basis, including referring to women as "bitches"; referred to defendant Linda McMahon as "the boss' bitch" (Plaintiff's EBT at p. 80, l. 10-24. p. 81, l, 13; p. 84, l. 21-24; Mills EBT at p. 61, l. 25, p. 62, l. 2-5); used other as sexist and/or homophobic language, specifically making a homosexual fellatio reference by stating that co-worker J. John Michaud was promoted because that is "what happens when you're under the desk" (Michaud Aff. at ¶ 14); called an African

American high school friend a "nigger"[2] (Plaintiff's EBT at p. 77, l. 16-18, p. 78, l. 3-8); used the anti-African American term "spook" (Michaud Aff. at ¶ 10); possessed hardcore pornography at the Highway Department; gave his friend defendant Curry a box containing numerous hard- and soft-core pornographic magazines as a going away present (Curry Aff. at ¶ 25; Exhibits J, K & M); told religious jokes, including jokes about Jews (Plaintiff's EBT at p. 78, l. 23-24, p. 79, l. 1-4); joked that he looks Hasidic himself (Plaintiff's EBT at p. 44); ribbed people about physical handicaps and used terms such as "retard", "moron", "idiot" and "imbecile" on a near-daily basis (Plaintiff's EBT at p. 85, l. 22-24, p. 86, l. 1-2; Mills EBT at p. 75, l. 3-19), even though one of his coworkers was mentally challenged (Mills EBT at p. 75, l. 25, p. 76, l. 2-5) and another was physically challenged (Michard Aff. at ¶ 12); announced, upon receiving his college degree, that he was "smarter than anyone [at the Highway Department]" (Michaud Aff. at ¶ 18; Curry Aff. at ¶ 22); teased people about a their weight (Plaintiff's EBT at p. 85, l. 22-24, p. 86, l. 1-2); called defendant Bischoff a "fat piece of shit" numerous times (Plaintiff's EBT at p. 86, l. 3-9); referred to defendant Bischoff, Pete Androsco, J. John Michaud and other overweight employees as "fat fucks" and "fat asses" (Mills EBT at p. 65, l. 17-22; p. 77, l. 3-6; p. 91, l. 25, p. 92, l. 2-9; Michaud Aff. at ¶ 12); ribbed defendant Curry about his baldness by telling him to put his hat back on because he was scaring people (Plaintiff's EBT at p. 87, l. 19-24, p. 88 l. 1-3); ribbed defendant Curry about his physically deformed abdomen by referring to him as "Quatto" (Mills' EBT at p. 66, l. 7-23; p. 77, l. 10-12; Curry Aff. at ¶ 12, 21); made anti-Asian comments by referring to Chinese food as "gook food" and referring to Vietcong shown in a television program as "little zipperheads" (Michaud Aff. at ¶9;

---

[2] If the plaintiff has no problem using such abhorrent language towards a friend, one has to wonder what kind of language he reserves for those who draw his ire.

23

Curry Aff. at ¶ 21); ribbed co-worker Bobby Gage about his loss of hearing by calling him a "deaf fuck"—even when Mr. Gage was in the room but could not hear the comment because of that hearing loss (Michaud Aff. at ¶ 12; referred to co-worker Bobby Ireland as a "dumb mick" and "stupid Irishman" (Michaud Aff. at ¶ 12; Curry Aff. at ¶ 21); called co-worker Scott Mills a "goat fucker" (Mills EBT at p. 89, l. 11-16); used homophobic slurs such as "queer", "fag" and "homo" on a daily basis, as a way of saying "good morning", even though there were no homosexuals employed at the Highway Department (Mills' EBT at p. 59, l. 11-25, p. 60, l. 2-6; Shields EBT at p. 63, l. 2-6; Michaud Aff. at ¶11); and has participated in the extensive use of cartoon animation at the Highway Department to make fun of co-workers by making cartoons which were designed to rib co-worker J. John Michaud about his troubles passing the written part of the Commercial Driver's License test (Michaud Aff at ¶ 16-17; Exhibits A & B to Exhibit J [First Request for Admissions from Defendants Curry and Bischoff] and Exhibit K [Plaintiff's Verified Response to First Request for Admissions from Defendants Curry and Bischoff]).

Similar to the plaintiff in *Reed v Shepard*, *supra*, who had "one of the foulest mouths" in her department, this plaintiff cannot credibly argue that he found his co-workers' participation in the bawdy, ribald behavior at the Highway Department hostile notwithstanding his own full fledged participation therein. Rather, the plaintiff's goal, as he referenced at his own deposition, it to be "retired young" on the proceeds of this lawsuit (Plaintiff's EBT at p. 211, l. 8-24, p. 212 l. 1-10; Mills EBT at p. 67, l. 25, p. 68, l. 2-5; Curry Aff. at ¶ 27). This Court must not countenance the plaintiff's attempt to use behavior in which he knowingly participated—and which he duped others into believing was acceptable—to serve as the basis for his latest get rich quick scheme.

## CONCLUSION

**WHEREFORE**, it is respectfully requested that the defendants' motions be granted in their entirety, together with such other, further and different relief as this Court may deem just and proper in the circumstances and the costs, disbursements and attorney's fees of this action.

Dated: White Plains, New York
      April 27, 2009

                    **OXMAN TULIS KIRKPATRICK**
                    **WHYATT & GEIGER, LLP**

                    By: _____
                    Gregory J. Spaun, Esq. (GS-4314)
                    120 Bloomingdale Road
                    White Plains, New York 10605
                    (914) 422-3900
                    *Attorneys for defendants Donald Curry*
                    *and Jeffrey Bischoff*

TO:    Lovett & Gould, LLP
        222 Bloomingdale Road
        White Plains, New York 10605
        *Attorneys. for plaintiff*

        Bond Schoeneck & King, PLLC
        1399 Franklin Avenue - Ste. 200
        Garden City, New York 11530
        *Attorneys for defendants Eric DiBartolo,*
        *Linda McMahon, Paul Holopeter,*
        *Linda Cooper and the Town of Yorktown*

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF WESTCHESTER      )

     JESSIE OWENS, being duly sworn, deposes and says: I am not a party to the action: I am over the age of 18 years of age and I reside in Westchester, New York.

     On **Monday, April 27, 2009**, I served the within **MEMORANDUM OF LAW** upon:

> Lovett & Gould, LLP
> 222 Bloomingdale Road
> White Plains, NY  10605
> *Attorneys for plaintiff*

> Bond Schoeneck & King, PLLC
> 1399 Franklin Avenue – Ste. 200
> Garden City, NY  11530
> *Attorneys for defendants Eric DiBartolo,*
> *Linda McMahon, Paul Holopeter,*
> *Linda Cooper and the Town of Yorktown*

by depositing a true copy of the same enclosed in a first-class, postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States postal Service within the State of New York.

                       _____
                       JESSIE OWENS

Sworn to before me this
27th day of April, 2009.

_____
NOTARY PUBLIC

GREGORY J. SPAUN
NOTARY PUBLIC, State of New York
No. 02SP6054146
Qualified in Westchester County
Commission Expires 1/29/20