UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
KYLE GULITZ,

                                         Plaintiff,


                  - against -

                                                                    08-CV-2388 (CS)

ERIC DiBARTOLO, individually, LINDA McMAHON,
individually, DONALD CURRY, individually, JEFFREY            **MEMORANDUM DECISION**
BISCHOFF, individually, PAUL HOLOPETER,                            **AND ORDER**
individually, LINDA COOPER, individually, and the
TOWN OF YORKTOWN, New York,

                                         Defendants.
-----------------------------------------------------------------------x

<u>Appearances:</u>
Drita Nicaj
Lovett & Bellantoni, LLP
White Plains, New York
*Counsel for Plaintiff*

Howard M. Miller
Bond, Schoeneck & King, PLLC
Garden City, New York
*Counsel for Defendants DiBartolo, McMahon, Holopeter, Cooper, and Town of
Yorktown*

Stuart Evan Kahan
Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP
White Plains, New York
*Counsel for Defendants Curry and Bischoff*

<u>Seibel, J.</u>

        Before the Court are Defendants' Motions for Summary Judgment.  (Docs. 32,

50.)

## I.    Background

        Plaintiff Gulitz brings discrimination claims under 42 U.S.C. § 1981, 42 U.S.C. §

1983, and New York State Executive Law § 296 against all Defendants.  Plaintiff also

brings Title VII claims against the Town of Yorktown (the "Town") only.[1]  Specifically, Plaintiff alleges that he was subjected to a hostile work environment because he is Jewish and that the Town retaliated against him for complaining of harassment.

Plaintiff Kyle Gulitz became a full-time employee of the Town Highway Department in November 2005 and remained in that position at all times relevant to the issues herein.  (Plaintiff's Counter-Statement of Material Facts Pursuant to Rule 56.1 ("Pl.'s 56.1.") ¶ 4.)  Defendant Eric DiBartolo has been the Highway Superintendent in the Town since January 1996 and the Director of Labor Operations since 2007.  (*Id.* ¶ 5.)  Defendant Linda McMahon was the Personnel Officer for the Town during the times at issue in this case.  (*Id.* ¶ 6.)  Defendant Linda Cooper was the Town Supervisor—the chief elected official of the Town—from 1996 until October 2007.  (*Id.* ¶ 9.)  Defendant Paul Holopeter has held the position of Deputy Highway Superintendent since 2004.  (*Id.* ¶ 8.)  Defendants Donald Curry and Jeffrey Bischoff have both been employed with the Town Highway Department for approximately twenty-three years and were two of Plaintiff's co-workers.  (*Id.* ¶¶ 7a, 7b.)

Plaintiff's father is Jewish and his mother is Presbyterian.  (*Id.* ¶ 11.)  Plaintiff identifies himself as being "of Jewish heritage."  (Affidavit of Howard Miller ("Miller Aff.") Ex. G ("Pl.'s Dep.") at 73.)  Plaintiff has, at times, denied being Jewish in response to anti-Semitic comments by Town employees.  (*See* Plaintiff's Response to Defendants Curry and Bischoff's Rule 56.1 Statement ("Pl.'s Response to Curry/Bischoff 56.1") ¶ 10; Pl.'s Dep. at 32.)

---

[1] Plaintiff initially brought a First Amendment retaliation claim against Defendant DiBartolo under Section 1983, but that claim has since been withdrawn.  (*See* Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n") at n.1.)

Plaintiff alleges that various discriminatory remarks and actions have been directed at him by his co-workers over the course of his employment at the Highway Department. Plaintiff alleges that DiBartolo told him, in front of his co-workers, that he "looked like one of those Jews with 'dreads.'" (Pl.'s 56.1 ¶ 28; Pl.'s Dep. at 42-43.)[2] According to Plaintiff, Curry has referred to Plaintiff as a "fucking Jew" a dozen times and a "dumb Jew" approximately a dozen times, (Pl.'s 56.1 ¶ 31; Miller Aff. Ex. L ("Mills Dep.") at 31-33), and Bischoff has referred to him as a "fucking Jew" on a dozen occasions and a "dirty Jew" on less than a dozen, (Pl.'s 56.1 ¶ 31; Mills Dep. at 31-33). Plaintiff also alleges that other co-workers (aside from Defendants) made derogatory comments such as "shut up Jew" or "my little Jew friend." (Pl.'s Dep. at 98-99.)

According to Plaintiff, Curry would walk into work and yell "Sieg Heil" while simulating a Nazi salute. (Pl.'s 56.1 ¶ 32; Pl.'s Dep. at 47, 67-69.) Curry admits that he gave a Nazi salute and yelled "Seig" every day until March 2007. (Miller Aff. Ex. K ("Curry Dep.") at 76-78.) If the salute was directed at Plaintiff, Plaintiff would mimic it and call Curry a "fucking asshole." (Pl.'s Dep. at 49-50.) Plaintiff alleges that Curry carries a dreidel for the purpose of mocking Plaintiff. (Pl.'s 56.1 ¶ 34; Pl.'s Dep. at 54-55.) Curry has also allegedly called Plaintiff the devil, said "the devil's pitchfork awaits you," and asked if he'd "had [his] Manischewitz lately." (Pl.'s 56.1 ¶ 35; Pl.'s Dep. at 55.) Plaintiff told Curry on several occasions that Curry's behavior bothered him and asked him to stop. (Pl.'s Dep. at 60, 69.)[3]

---

[2] Plaintiff acknowledges, however, that "it's possible" that, on occasion, he would refer to himself as "looking Hassidic [sic]." (Pl.'s Dep. 44.)

[3] Plaintiff admits that he has used the words "guinea" and "spic," (Pl.'s Dep. at 76), but specifically denies that he used any ethnic slurs in the workplace, (Pl.'s Aff. ¶ 8). Plaintiff also states that it's "possible" he told jokes about Jews. (Pl.'s Dep. at 79.)

Some of Plaintiff's co-workers also drew offensive depictions of him and posted these drawings, in addition to various flyers, on his locker.  In April 2006, Curry drew a picture of Plaintiff holding a menorah atop a pitchfork, with horns coming out of his head, and bags of money behind him.  (Pl.'s 56.1 ¶¶ 41-42; Pl.'s Dep. at 100; Memorandum in Support of Summary Judgment of Defendants Curry and Bischoff ("Curry/Bischoff Mem.") at Ex. F-19.)  The picture was titled "Komp Kase Kyle" and was posted on Plaintiff's locker.  (Pl.'s 56.1 ¶ 41.)  Curry acknowledged that the title was meant to be a reference to the Ku Klux Klan.  (Pl.'s 56.1 ¶ 42; Curry Dep. at 12.)  The picture was apparently intended, in part, to mock Plaintiff for filing a bogus workers' compensation claim.  (Affidavit of Donald Curry ¶ 19.)  Also in the Spring of 2006, co-workers posted a flyer for the "Reformed Temple of Putnam Valley" and a cartoon entitled "Chronicles of Captain Kosher" on Plaintiff's locker.  (Pl.'s Dep. at 113-14.)

Plaintiff did not report these drawings to anyone at the time.  (Pl.'s Dep. at 101, 115.)  Plaintiff alleges, however, that DiBartolo was aware of the "Komp Kase Kyle" drawing because he had been in the locker room where the picture was in plain view.  (*Id.* at 101-02.)  Plaintiff did not complain to anyone about Bischoff's offensive comments either.  (*Id.* at 86.)  But Plaintiff asserts that he made "numerous" informal complaints to Defendant DiBartolo in early or mid 2006.  (*Id*. at 122-23.)  Plaintiff cited one example of such an informal complaint in his deposition.  In 2006, when Curry started laughing and said "oh geez" as they saw a group of Hasidic boys walking near a worksite, Plaintiff asked DiBartolo to quiet Curry down.  (Pl.'s 56.1 ¶ 40; Pl.'s Dep. at 123.)  In response, DiBartolo told Curry to "knock it off."  (Pl.'s Dep. at 123.)  Upon being asked if he made any other informal complaints to DiBartolo, Plaintiff responded that there was one

occasion at Dante's Deli in the summer of 2006 when Plaintiff said, "lay off . . . the Jew comments." (*Id*. at 124.) It is not clear whether Plaintiff was referring to comments made by DiBartolo or comments made by other co-workers. (*Id.*) Plaintiff asserts that he did not make more formal complaints at the time because he was "on probation" and feared being fired as a result of any complaints. (*Id*. at 115-16.)

Later in 2006, Defendant Curry drew a picture, in the dust on a large water tank, of a menorah, a Star of David, the Dead Sea Scrolls with pseudo Hebrew lettering, and a depiction of Plaintiff saying "oi." (Pl.'s 56.1 ¶ 48; Pl.'s Dep. at 117.) Plaintiff was shown this drawing on December 13, 2006. Plaintiff brought this picture, and the "Komp Kase Kyle" picture, to DiBartolo's attention the next day. (Pl.'s 56.1 ¶ 49; Pl.'s Dep. at 120.) Minutes after Plaintiff showed DiBartolo the pictures, DiBartolo called the Department workers into a meeting that Plaintiff secretly recorded. At the meeting, DiBartolo showed the employees the pictures and said, "[Kyle] has a major problem with it and so do I." (*Id*. at 126; Affidavit of Eric Dibartolo ("DiBartolo Aff.") Ex C at 6:40.) Although the recording is at times inaudible, DiBartolo can be heard stating that "it's coming to an end"—presumably referring to the offensive pictures. (DiBartolo Aff. Ex. C at 6:48.) DiBartolo then informed McMahon, the Personnel Officer, of Plaintiff's complaint. (DiBartolo Aff. ¶ 9.)

Soon after DiBartolo's December 14th meeting with the Highway Department employees, Plaintiff met with McMahon to discuss his allegations. (Pl.'s Dep. at 129.) At that meeting, McMahon gave Plaintiff paperwork and said Plaintiff needed "to fill out the paperwork before she could do anything." (*Id.*) Sometime after that meeting, but before a second meeting with McMahon on January 24, 2007, DiBartolo allegedly told

Plaintiff that the Town was going to fire him if he pursued his complaint.  (*Id*. at 127-28, 141.)[4]  At the January 24th meeting with Plaintiff, McMahon made further attempts to get Plaintiff to cooperate with an investigation.  (Affidavit of Linda McMahon ("McMahon Aff.") Ex. E ("Jan. 24 Tr.").)  She advised Plaintiff at several points in the conversation that the Town wanted to conduct an investigation, but they needed him to provide more information about the harassment.  (*See, e.g.*, Jan. 24 Tr. at 6-7 (stating that the Town "wants to react to things like these," and "we're trying to find out . . . to put an end to everything").)  Plaintiff declined to cooperate, stating he did not want to push the issue any further.  (*See generally* Jan 24 Tr.)  McMahon assured Plaintiff that he was free to come back if he changed his mind.  (*Id.* at 15.)

Overall, Plaintiff conveyed satisfaction with the way DiBartolo and McMahon had responded to his complaint.  During the meeting, Plaintiff told McMahon (falsely, he now claims) that DiBartolo's meeting with the employees had been effective at ending the harassment.  (Pl.'s Dep. at 130; Jan. 24 Tr. at 5.)  He also told McMahon that her "concern has been above and beyond anything else I could ask for."  (Jan 24 Tr. at 9.)  It appeared that Plaintiff's only gripe with the way his supervisors had acted was that they had not kept his complaint anonymous—apparently based on DiBartolo, at the December 14th meeting at the Highway Department, having specified that Plaintiff was the complaining employee—and as a result he was being ostracized by some.  (*See generally* Jan. 24 Tr.)  Plaintiff claims, however, that he was not entirely truthful with McMahon

---

[4] Specifically, Plaintiff alleges:  "[DiBartolo] alerted me that if I should pursue this, that town hall had charges on me that they were going to fire me for.  Not only that, the men were going to band together in the back room, and they were going to file complaints, charges against me, and I was going to be canned.  Not only that, this type of thing looks poorly on a resume or anything else.  It would follow me, and I would not be able to get a job anywhere for the rest of my life."  (Pl.'s Dep. at 141.)

because he was afraid McMahon would terminate his employment if he pursued the charges, (Pl.'s 56.1 ¶ 56; Pl.'s Dep. at 128, 133), and he did not want to cause "problems with management," (Pl.'s Dep. at 138-39).  Plaintiff did not tell any of the other Defendants about DiBartolo's warning that he would be fired if he filed a complaint.  (*Id*. at 140-42.)

On March 23, 2007, Plaintiff told DiBartolo that, while a co-worker backed a truck into a building, Bischoff stood by laughing.  (*Id*. at 62.)  DiBartolo confronted Bischoff about this behavior.  When Bischoff asked who had told DiBartolo he was laughing, DiBartolo pointed at Plaintiff.  As a result, Defendant Bischoff allegedly threatened to kill Plaintiff and yelled that he was "sick of this fucking jew."  (Pl.'s 56.1 ¶ 65; Pl.'s Dep. at 62-65.)  He did this in the presence of DiBartolo, who at some point during the altercation, stepped in and separated the two.  (Pl.'s 56.1 ¶ 64; Pl.'s Dep. at 64-65.)  Bischoff also stated that he did not want to "work with the fucking Jew," and "everything was great until this fucking Jew got here."  (Pl.'s 56.1 ¶¶ 61, 65-66.)  Plaintiff reported the incident to the police.  (McMahon Aff. Ex. H ("March 28 Tr.") at 4.)  After this incident, Plaintiff and Bischoff were separated in the workplace.  (Pl.'s Dep. at 66.)

On March 26, 2007, Bischoff allegedly brought into the Department's workplace a swastika armband he had found in someone's trash, and gave it to Curry.  (Pl.'s Dep. at 45-47.)  Curry wore the swastika in the workplace and gave a simulated Nazi salute to the Department's general foreman.  (Pl's 56.1 ¶ 70.)  Plaintiff was not present when the swastika was brought in, and never actually saw the armband, (Pl.'s Dep. at 45), but was told of the incident, (*id.* at 45-46).

7

After these incidents, Plaintiff went to speak with Defendant McMahon about Bischoff's threats to kill Plaintiff.  Plaintiff did not mention any religious slur, and McMahon was not sure if it was a police matter or a harassment matter.  (McMahon Aff. ¶ 10.)  Unsatisfied with McMahon's reaction, Plaintiff met with Cooper, the Town Supervisor, later that same day.  (Pl.'s 56.1 ¶¶ 76-77.)  McMahon "forced" herself into Plaintiff's meeting with Cooper.  (*Id.* ¶ 77.)  At the meeting, Cooper assured Plaintiff that his concerns would not be "swept under the rug."  (Mar. 28 Tr. at 19-20.)  Plaintiff told Cooper (falsely, he now claims) that he was satisfied with the way everything had been handled.  (Pl.'s Dep. at 155; Mar. 28 Tr. at 31.)  But he claims that he omitted many details because McMahon was in the room.  (Pl.'s 56.1 ¶ 82.)  Plaintiff did, however, mention that someone had found a swastika armband and given it to another with the suggestion that it be shown to Plaintiff.  (Pl.'s Dep. at 45-46, 156; Mar. 28 Tr. at 8.)

Also on March 28, 2007, Plaintiff wrote a formal complaint, signed by McMahon, detailing the March 23 confrontation with Defendant Bischoff.  Nowhere in this complaint, however, does Plaintiff mention the anti-Semitic remarks that Plaintiff claims in his deposition.  (*See* Affidavit of Drita Nicaj ("Nicaj Aff.") Ex. 20.)

On April 2, 2007, DiBartolo, Holopeter, and McMahon directed Plaintiff to complete a harassment complaint form.  (Pl.'s Dep. at 92-93, 148-49.)  No copy of that complaint has been provided to the Court.  In the beginning of April 2007, Curry, Bischoff, and several other co-workers were interviewed in connection with the swastika incident.  (Pl.'s 56.1 ¶¶ 86, 97-104.)  Bischoff and other co-workers were also interviewed in connection with Plaintiff's March 23rd confrontation with Bischoff.  (Pl.'s 56.1 ¶ 106.)  For their involvement in the swastika incident, Bischoff and Curry each

received a letter of reprimand and Curry lost three days' vacation.  (*See* Pl.'s Opp'n at 19; McMahon Aff. Exs. M, N.)[5]

In mid-2007, Plaintiff was transferred to an area known as the Hill.  (Pl.'s 56.1 ¶ 118.)  Plaintiff was later transferred back to the Highway Department for an unspecified period of time, and then transferred to the Parks Department.  (*Id.* ¶ 120.)  At the Parks Department, Plaintiff was allegedly under the supervision of DiBartolo's cousin, who had been alerted of the "circumstances" surrounding Plaintiff's transfer.  (*Id.*)  Plaintiff alleges that DiBartolo's cousin subjected him to "verbally abusive treatment" and assigned him to "demeaning tasks" including cleaning toilets and shoveling snow.  (Pl.'s Opp'n at 26; Pl.'s Dep. at 201-02.)

In April 2007, Plaintiff was interviewed for a promotion to a Motor Equipment Operator ("MEO") position.  (Pl.'s 56.1 ¶ 86.)  John Michaud was awarded the position instead of Plaintiff.  (*Id.* ¶ 91.)

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit

---

[5] Plaintiff was also issued a letter of reprimand for making "wrongful allegations" against Bischoff that "developed into" the March 23 confrontation.  (*See* DiBartolo Aff. Ex. E.)

under the governing law . . . ." *Id.* On a motion for summary judgment, courts must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks omitted). The party moving for summary judgment bears the burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the nonmoving party "to present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at 137.

     B.    <u>Title VII</u>

        1.    *Hostile Work Environment Standard*

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to succeed on a hostile work environment claim under Title VII, Plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). Plaintiff must come forward with "evidence not only that [he] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be hostile as well. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (citing *Harris*, 510 U.S. at 21-22) (internal quotation marks and alterations

omitted); *see Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004).  Furthermore, "[a] plaintiff must also demonstrate that [he] was subjected to the hostility because of [his] membership in a protected class."  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

"To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  "Pervasive" harassment is harassment that is "more than episodic," and instead, "continuous and concerted."  *Hayut*, 352 F.3d at 745 (quoting *Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir.1989)).  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986)).  Instead, "there must be a steady barrage of opprobrious racial comments."  *Schwapp*, 118 F.3d at 110 (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).  "The environment," however, "need not be unendurable or intolerable."  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted).  "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases."  *Id.* (internal citations and quotation marks omitted).

2.    *Plaintiff's Membership in a Protected Class*

As a threshold matter, Defendants argue that Plaintiff cannot prevail because he is not Jewish, and therefore, not a member of a "protected class."  (Curry/Bischoff Mem. at

5-6[6]; Memorandum in Support of the Town Defendants' Motion for Summary Judgment

("Town Mem.") at 14 n.7.)  It is undisputed that Plaintiff's father is Jewish and his

mother Presbyterian.  Defendants, relying on the affidavit of a Rabbi, assert that to be

considered Jewish one must either be born to a Jewish mother or officially convert.

(Curry/Bischoff Mem. at 7.)  They argue that Plaintiff, therefore, cannot be considered

Jewish because his mother is not Jewish and he has neither converted nor practiced the

Jewish religion.  (*Id.*)  It is not the Court's place to opine on how various Jewish sects

define the requirements for "being Jewish."  There is certainly no reason to believe that

Plaintiff's co-workers applied such a limited definition.  What is relevant is that Plaintiff

identifies himself as "of Jewish heritage"—an assertion fully supported by the fact that

his father is Jewish.  That Plaintiff does not practice the Jewish religion does not prevent

him from being of Jewish heritage—that is, a descendant of those who did so practice—

or from being discriminated against on account of the religion of his forbears.

Defendants provide no legal authority for the proposition that a Plaintiff whose father, but

not mother, is Jewish, and who was allegedly discriminated against on that basis, does

not fall within a protected class.[7]  Absent case law to the contrary, I find that Plaintiff's

father being Jewish is sufficient to place him in a protected class.[8]

---

[6] Defendants Curry and Bischoff raise this in connection with the Section 1983 claims, but it also applies to the Title VII analysis.

[7] Defendants cite a series of cases for the proposition that Jewish plaintiffs are within a protected class only "on the basis of their respective adherence to the Jewish faith—not the mere claim of a Jewish 'heritage.'"  (Curry/Bischoff Mem. at 6.)  In at least two of those cases, however, the plaintiff's level of observance played no role in the court's finding that he was a member of a protected class.  *See Pesok v. Hebrew Union Coll.-Jewish Inst. of Religion*, 235 F. Supp. 2d 281 (S.D.N.Y. 2002); *Kamkar v. Pitney Bowes Corp.*, No. 07-CV-4512, 2008 WL 2945974 (D.N.J. July 29, 2008).  That some cases identify religious Jews as members of a protected class does not mean that non-religious Jews are excluded from that protected class.

3.      *Severity of Abuse*

Given the undisputed and disputed facts in this case, I cannot decide, as a matter of law, that Plaintiff has not shown the requisite degree of hostility and abuse necessary to support a hostile work environment claim.  Plaintiff alleges that Defendants Curry and Bischoff directed anti-Semitic comments at him on dozens of occasions.  He further alleges that Curry yelled "Seig Heil" and simulated a Nazi salute every day, and at least once in Plaintiff's presence.  Curry drew offensive drawings of Plaintiff and wore a swastika in the workplace.  On March 23, 2007, Bischoff yelled that he did not want to "work with this fucking Jew," among other similarly charged epithets.  A jury could find that these actions, taken together, constituted a "steady barrage" of discriminatory comments and altered Plaintiff's work environment for the worse.

Defendants argue that "Title VII . . . should not be expanded into 'a general civility code' such that 'male-on-male horseplay' would become actionable."  (Town Mem. at 11 (citing *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998)).)  Specifically, Defendants contend that the work environment was not discriminatory because everyone participated in the hostile behavior and no race, creed, or ethnicity was spared.  (Town Mem. at 12.)  Indeed, the Supreme Court in *Oncale* held that any allegedly hostile behavior should be viewed in the proper context, and innocuous conduct such as horseplay or flirtation should not be mistaken for discrimination.  *Onacle*, 523

---

[8] Defendants argue that Plaintiff sometimes denied being Jewish and that they referred to his Judaism to get a rise out of him, not to discriminate.  (Curry/Bischoff 56.1 ¶¶ 10-13.)  This argument may raise fact issues as to whether Plaintiff was harassed because of his membership in a protected class, but it does not entitle Defendants to summary judgment.  I am not prepared to say that a non-practicing person with a Jewish father cannot be the subject of hostility based on religion.

U.S. at 80-81.  But the alleged comments in this case were not innocuous as a matter of law.  Plaintiff's allegations, if true, indicate that anti-Semitic comments and actions were repeatedly directed at him.  While teasing and offensive comments about all groups may have been part and parcel of the Highway Department workplace, such circumstances do not as a matter of law absolve Defendants from liability for discriminatory remarks made or actions taken toward one particular group.[9]  A jury should decide whether the workplace is properly characterized as featuring immature and offensive bantering, or actual hostility.

Defendants also argue that other courts have granted summary judgment in circumstances similar to this one.  But the cases upon which Defendants heavily rely, *Schwapp*, 118 F.3d 106, and *Bolden v. PRC Inc*., 43 F.3d 545 (10th Cir. 1994), do not support their argument.  In *Schwapp*, 118 F.3d at 110-12, the Second Circuit found that summary judgment was *inappropriate* where Plaintiff had alleged twelve incidents of hostile, discriminatory behavior.  In *Bolden v. PRC Inc*., 43 F.3d 545, an out of circuit case, the court granted summary judgment because the plaintiff complained of only two

---

[9] In support of their argument that no hostile work environment existed, Defendants maintain that "[s]eemingly anti-Semitic comments such as 'cheap as a Jew' and 'don't Jew me on the price' were routinely made at the Highway Department, but were used 'whether you're Jewish or not, doesn't seem to matter.'"  (Curry/Bischoff 56.1 ¶ 14.)  The implication of this statement appears to be that such comments are non-discriminatory as long as they are directed at Jews and non-Jews alike.  Not only is this argument wrong as a matter of law, but it is offensive in itself.  Such comments, relying on an offensive stereotype, are anti-Semitic no matter to whom they are directed, and Defense counsel's efforts to excuse them demonstrates a fundamental misapprehension of the injury being alleged.  Even more mind-boggling is Defendants' argument that the term "nigger," when used as a synonym for "slow, uncouth, uneducated [or] [s]tuff like that," (Mills Aff. at 58), is not "an anti-African American slur" because it was directed at those who are not black.  (Curry/Bischoff Mem. at 19.)  I find it hard to believe that counsel does not understand why African-Americans or others would find such usage offensive.

overtly racial remarks and one arguably racist comment.  *Id.* at 551.  In fact, the court specifically said that its holding was narrow, and that claims will not necessarily be defeated "if the plaintiff works in a place where several of the workers are taunted."  *Id.*

If Plaintiff's testimony is believed—which it must be for the purposes of these Motions—he was subject to at least as many incidents of discrimination as the plaintiff in *Schwapp*.[10]  Furthermore, even behavior that is not directed at Plaintiff can be used to support a hostile work environment claim.  *Whidbee v. Garzarelli Food Specialties*, 223 F.3d 62, 71 (2d Cir. 2000) (discriminatory comments relevant even when made outside plaintiff's presence); *Schwapp*, 118 F.3d at 111 ("the fact that a plaintiff learns second-hand of a racially derogatory comment or joke . . . can impact the work environment").  Therefore, Curry's daily Nazi salute, which was not always directed at Plaintiff, and Curry's donning of the swastika armband, which Plaintiff did not witness firsthand, can support his hostile work environment claim.

Defendants contend that Plaintiff's hostile work environment claim should be dismissed because Plaintiff himself contributed to the hostile environment.  (*See* Curry/Bischoff Mem. at 16-18; Town Mem. at 13.)  Defendants state that Plaintiff used ethnic and homophobic slurs, insulted others based on their physical characteristics, "welcomed his friend's anti-Semitic barrages in front of his co-workers, and even told Jewish jokes himself."  (Town Mem. at 13.)  The in-district case that Defendants cite in support of this argument, *Rasco v. BT Radianz*, No. 05-CV-7147, 2009 WL 690986 (S.D.N.Y. Mar. 17, 2009), states that "such behavior on the part of Plaintiffs may weaken

---

[10]  Indeed, Defendants' use of the phrase "anti-Semitic barrage" to describe Defendant Curry's behavior undermines their argument that the discrimination was not pervasive.  (*See* Town Mem. at 13.)

their claim that they found the workplace subjectively hostile." *Id.* at 12.  But the court went on to deny summary judgment because this issue involved credibility and was more properly resolved by a jury.  *Id.*  While Plaintiff's own conduct (if indeed it occurred, particularly at the workplace) may make it more difficult for him to convince the jury that he subjectively felt hostility, or that he was thereby damaged, it is not sufficient to find the environment non-hostile, objectively or subjectively, as a matter of law.

Defendants also point out that Plaintiff remained friends with Defendant Curry, and argue that such feelings belie Plaintiff's assertion that he perceived Curry's behavior to be hostile.  (*See* Curry/Bischoff Mem. at 16-18; Town Mem. at 13.)  That a plaintiff remains friends with some of his harassers, however, is also only one factor in determining whether the environment was subjectively hostile.  *See, e.g.*, *Milton v. Lenox Hill Hosp.*, 160 F. Supp. 2d 687, 697-98 (S.D.N.Y. 2001) (court found environment was not subjectively hostile because plaintiff remained friends with alleged harassers in spite of alleged racial animus, because plaintiff promoted them after learning of their discriminatory beliefs, *and* because plaintiff explicitly stated that their comments did not offend him).  Therefore, the extent to which Plaintiff's participation in the hostile behavior[11] and his continued affection for Defendant Curry negate his subjective claim that the environment was hostile is a question more appropriately answered by a jury.

4.      *Imputation to the Town*

Because individuals cannot be held liable under Title VII, Plaintiff's employer—the Town—is appropriately the only defendant on this claim.  To prevail on a Title VII

---

[11] It should be noted that Plaintiff does not affirmatively admit to contributing to the discriminatory bickering that appears to have been a routine part of the Highway Department workplace.  (Pl.'s Aff. ¶ 8; Pl.'s Dep. at 74, 78-79.)

hostile work environment claim, Plaintiff must also demonstrate "'that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Schwapp*, 118 F.3d at 110 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996)).

The Court finds it necessary to separate this analysis into two parts: (1) whether there is a basis for imputing to the Town harassment that occurred before Plaintiff brought the drawings to DiBartolo's attention in December 2006, and (2) whether there is a basis for imputing harassment that came to the Town's attention in December 2006 and early 2007.

a.      Pre-December 2006 Harassment

An employer who is aware that an employee is being subjected to harassment by co-workers may not stand idly by.  *See Snell*, 782 F.2d at 1104.  In certain circumstances, agency principles dictate that a supervisor's knowledge of such harassment should be imputed to the employer.  For example, if a supervisor is "charged with a duty to act on the knowledge and stop the harassment," his knowledge is imputed to the employer. *Arias v. Nasdaq/Amex Mkt. Group*, No. 00-CV-9827, 2003 WL 354978, at *9 (S.D.N.Y. Feb. 18, 2003) (citing *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997)).  Defendant DiBartolo, as the Highway Department Head, was one of three people to whom complainants were encouraged to go if they had been harassed.  (*See* Nicaj Aff. Ex. 1 ("An aggrieved person . . . should immediately meet with his or her Department Head, Personnel Officer or Town Supervisor to discuss an allegation of harassment.").)  The policy, it appears, "charged" DiBartolo with a duty to act on knowledge of harassment. Therefore, his knowledge is imputed to the Town, and the Town would be liable if

DiBartolo knew Plaintiff was being subject to pervasive harassment, but did nothing about it.

As stated above, Plaintiff alleges that he informally complained to DiBartolo about discriminatory behavior before December 2006.  Specifically, he alleges that he complained to DiBartolo about Curry's laughter and "oh geez" comment as they passed a group of Hasidic boys, and maintains that at some point he asked DiBartolo to "lay off" the "Jew comments."  (Pl.'s 56.1 ¶ 40; Pl.'s Dep. at 122-24.)  Furthermore, Plaintiff alleges that DiBartolo saw the "Komp Kase Kyle" drawing when it was posted on Plaintiff's locker in April 2006.  (Pl.'s Dep. at 102.)  DiBartolo, on the other hand, appears to claim that the December 14 complaint was the first time discriminatory conduct against Plaintiff was brought to his attention.  (DiBartolo Aff. ¶ 7.)  This is enough to create an issue of fact as to whether DiBartolo was "aware" of the alleged hostile work environment before Plaintiff came to him with the pictures in December 2006.  *See Feingold*, 366 F.3d at 152 (allegation that supervisor was aware of the harassment and did not remedy the situation is sufficient to permit a trier of fact to impute the discriminatory conduct to the employer).  Therefore, the Court cannot find as a matter of law that pre-December 2006 harassment is not imputed to the Town.

> b.  Harassment of which Town was made aware in December 2006 and early 2007

The Town does not dispute that it became aware, beginning in December 2006, of certain of Plaintiff's allegations that he was being harassed.  Accordingly, the Town does not argue that knowledge of those allegations should not be imputed to it.  Instead, the Town argues that it is not liable for this harassment because it has satisfied the elements of the *Faragher/Ellerth* defense.

The Second Circuit has adopted the Supreme Court's *Faragher/Ellerth* framework for determining whether an employer is liable for a hostile work environment created by its employees.  *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006); *Chenette v. Kenneth Cole Prods.*, No. 05-CV-4849, 2008 WL 3176088, at *10 (S.D.N.Y. Aug. 6, 2008).  Under that standard, an employer can avoid liability by establishing that "(1) the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Ferraro*, 440 F.3d at 101 (internal quotation marks omitted). "One way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003).  But the mere existence of an anti-harassment policy is not dispositive.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004).  If the policy is ineffective—for example, if an employer fails to adequately or promptly investigate a complaint, or the policy is generally ignored—the employer may not avail itself of the *Faragher/Ellerth* defense.  *See id.* (reversing grant of summary judgment because defendant had not "conclusively demonstrated the effectiveness of its anti-harassment policy").

The Town has in place an anti-harassment policy prohibiting harassment based on "race, color, sex, religion . . . or any other legally protected status . . . ."  (Nicaj Aff. Ex. 1.)  As noted above, the policy directs the complainant to "immediately meet with his or her Department Head, Personnel Officer or Town Supervisor to discuss an allegation of

harassment." (*Id.*)  Plaintiff received a copy of the policy at the commencement of his

employment. (*See* Miller Aff. Ex. H; Pl.'s Dep. at 38-39).[12]

It is not clear, however, that the Town's policy proved effective in this instance.

It is undisputed that Plaintiff complained to DiBartolo about harassing behavior in

December 2006.  Such a complaint appears to be in accordance with the Town's policy

that a complainant bring the harassment to the attention of his "Department Head."  After

this initial complaint, however, DiBartolo allegedly threatened that Plaintiff would lose

his job if he pursued the complaint any further.  As a Department Head, DiBartolo was at

least partially responsible for making sure complaints were taken seriously and properly

addressed.  If he did in fact threaten Plaintiff, deterring him from pursuing a potentially

legitimate harassment complaint, that threat would vitiate the effectiveness of the Town's

policy.  In other words, the Town cannot claim that it had an effective policy if one of the

three persons in charge of implementing that policy discouraged employees from

pursuing legitimate complaints.  In light of the alleged threat, there is an issue of fact as

to whether the Town, through the actions of its Highway Department Head, took

reasonable care to promptly correct the harassment.  The Court, therefore, cannot find for

---

[12] As a peripheral matter, Plaintiff argues that DiBartolo violated the harassment policy by disclosing to Plaintiff's co-workers that he was the one who had made the complaint.  While the policy states that "the Town endeavors to keep such matters confidential to the extent practicable," it does not guarantee such confidentiality.  In any event, a breach of any confidentiality provision, by itself, would not amount to a constitutional violation.  Furthermore, while DiBartolo could have discussed the offensiveness of the drawings without stating that Plaintiff had complained, it would have been difficult, if not impossible, to have that discussion without at least revealing that Plaintiff was the subject of the drawings. *See Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162-63 (2d Cir. 2006) (anti-harassment policies not required to guarantee confidentiality; acknowledging virtual impossibility of maintaining confidentiality and also conducting a thorough investigation).

the Town as a matter of law on the reasonable care prong of the *Faragher/Ellerth*
defense.

The Town argues that it did take reasonable care to address Plaintiff's allegations,
and that it was Plaintiff who unreasonably failed to take advantage of the complaint
procedures it provided.  (Town Mem. at 20-22.)  It emphasizes that in January 2007,
McMahon attempted several times to get Plaintiff to detail his grievances so she could
conduct an investigation, but Plaintiff refused to cooperate with her efforts.  (*Id.* at 21.)
The Town also notes that Plaintiff conveyed to McMahon that DiBartolo's meeting had
the effect of ending the harassment, and that he was satisfied with the way DiBartolo and
McMahon had reacted to the situation.  (*Id.* at 21-22.)

Plaintiff alleges that these expressions of satisfaction were false.  He alleges that
he lied and refused to cooperate because he was afraid of losing his job if he pursued the
complaint further.  For a fear of retaliation to excuse a plaintiff from taking advantage of
complaint procedures, that fear must be credible.  *See Leopold v. Baccarat*, 239 F.3d 243,
246 (2d Cir. 2001).  Courts within this Circuit have often found that such fears are not
credible when there is no direct evidence that the plaintiff would be retaliated against.
*See, e.g.*, *id.*; *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999);
*Smith v. Am. Int'l Group, Inc.*, No. 01-CV-1562, 2002 WL 745603, at *7-8 (S.D.N.Y.
Apr. 26, 2002); *Patterson v. CBS, Inc.*, No. 94-CV-2562, 2000 WL 666337, at *8
(S.D.N.Y. May 22, 2000).  In this case, however, Plaintiff alleges that DiBartolo—
presumably someone with considerable control over his employment—threatened, or at
least warned, that he would lose his job if he pursued his complaint.  If true, this would
give rise to a credible fear, and at least create an issue of fact as to whether Plaintiff

unreasonably failed to take advantage of the Town's complaint procedures.  *Compare*

*Patterson*, 2000 WL 666337, at *8 (granting summary judgment where plaintiff did not

allege that supervisor made any statements or representations that would give rise to a

fear of retaliation), *with Suarez v. Am. Stevedoring, Inc.*, No. 06-CV-6721, 2009 WL

3762686, at *20-21 (E.D.N.Y. Nov. 10, 2009) (denying summary judgment where lawyer

warned plaintiff that supervisor might retaliate and supervisor told plaintiff, "you'll see

what happens," because a jury may find that such facts give rise to a "credible fear").

The existence of an issue of fact as to whether Plaintiff unreasonably failed to take

advantage of the Town's complaint procedures also precludes a finding that the Town has

satisfied the requirements of the *Faragher/Ellerth* defense.

In light of the issues of fact articulated above, the Court cannot find as a matter of

law that the Town is not liable on Plaintiff's Title VII hostile work environment claim.

5.      *Title VII Retaliation*

Title VII forbids an employer from discriminating against an employee "because

[the employee] has opposed any practice made an unlawful employment practice by this

subchapter, or because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this subchapter . . . ."  42 U.S.C.

§ 2000e-3(a).  Plaintiff alleges that he was retaliated against for complaining of

harassment.  Specifically, he alleges that the Town's retaliatory actions include

transferring Plaintiff to the Hill and to the Parks Department, and the failure to promote

him to the MEO position in April 2007.  (Pl.'s Opp'n at 21.)

Title VII retaliation claims are analyzed under the *McDonnell Douglas* three-step

burden-shifting analysis.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.

2005).  First, to establish a *prima facie* case of retaliation, Plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Id.*

If Plaintiff establishes a *prima facie* case, the onus then "falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* at 173.  Finally, "once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Id.*  Neither party in this case disputes that the first two elements of the *prima facie* case are satisfied.  The rest of the requirements remain in issue.

      a.      Transfers to the Hill and the Parks Department

To prevail on a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co.  v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *see Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006).  A transfer may constitute an adverse employment action if it is "accompanied by a negative change in the terms and conditions of employment."  *Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir. 1999).

Plaintiff admits that he wanted to be transferred to the Hill.  (Pl.'s Opp'n at 25.) Furthermore, he has not alleged any facts indicating that his transfer to the Hill

constituted a negative change in the conditions of his employment.[13]  Given Plaintiff's desire to be transferred and the absence of evidence that his working conditions changed for the worse, a jury could not conclude that the transfer would deter a reasonable worker from making a charge of discrimination.  Therefore, his transfer to the Hill does not amount to retaliation.

Plaintiff does allege, however, that his transfer to the Parks Department constituted a negative change in the conditions of his employment.  There, he alleges that DiBartolo's cousin-in-law subjected him to "verbally abusive treatment" and assigned him to "demeaning tasks" including cleaning toilets and shoveling snow.  The Court cannot say as a matter of law that being subject to such treatment would not deter a similarly situated individual from exercising his or her constitutional rights.  *See, e.g.*, *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (where plaintiff transferred to a position with lower level responsibilities, fact finder could infer that reasonable person in plaintiff's position would be deterred from making a charge of discrimination).

Plaintiff also satisfies, albeit barely, the "causal connection" element of the *prima facie* case with respect to his transfer to the Parks Department.  Plaintiff testified that DiBartolo made his cousin aware of the "circumstances" under which Plaintiff was being transferred.  (Pl.'s Dep. at 202.)  Considering this alleged communication and the ensuing abuse to which Plaintiff was allegedly subjected while under DiBartolo's cousin's supervision—and viewing both these facts in light of DiBartolo's alleged threat that

---

[13] Not only does Plaintiff admit that he wanted to be transferred, he also acknowledges that the transfer to the Hill allowed him substantial leisure time on the job. (Pl.'s Dep. at 194.)

Plaintiff would suffer consequences if he complained, (*see supra* note 4)—a jury could

infer a causal connection between Plaintiff's complaints and his transfer to the Parks

Department.

The Town states, in conclusory fashion, that it had "legitimate reasons" for

transferring Plaintiff to the Parks Department, but it does not articulate what those

reasons were.  (Town Mem. in Reply at 10.)  Therefore, the Town has failed to establish,

at least at this stage, a legitimate non-discriminatory reason for Plaintiff's transfer to the

Parks Department.  Accordingly, summary judgment on this transfer-related retaliation

claim is denied.

### b. Failure to Promote

Plaintiff alleges that the Town retaliated against him by promoting John Michaud

to the MEO position instead of Plaintiff.  Failure to promote is generally considered an

adverse employment action for the purpose of Title VII retaliation.  *See Rouse v. City of*

*New York*, No. 08-CV7419, 2009 WL 1532054, at *12 (S.D.N.Y. June 2, 2009).

Furthermore, the close temporal proximity between the protected speech in March 2007

and the adverse action in April 2007 is sufficient to establish a presumption of causation.

*See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (causation prong

satisfied when discharge came less than two months after plaintiff complained to

management).  Therefore, Plaintiff has established a *prima facie* case of retaliation for the

Town's failure to promote him to the MEO position.

The Town offers non-discriminatory reasons for its failure to promote Plaintiff.  It

asserts that it promoted Michaud because he was a much more experienced driver than

Plaintiff, and because Plaintiff had had several accidents while driving Town trucks,

including an incident where a truck he was driving slid off the road.  (Town Mem. at 27.)
Plaintiff, however, argues that the Town's proposed non-discriminatory reasons are
simply a pretext for retaliation.  First, he argues that, contrary to the Town's assertions,
he had more experience performing MEO duties than Michaud, and that the accidents
were not his fault.  (Pl.'s Mem. at 24.)  Furthermore, Plaintiff argues that prior to his
complaint, DiBartolo had promised to promote him to the next available MEO vacancy.
(Pl.'s Mem. at 24.)  Plaintiff also alleges that Michaud was promoted not for being more
qualified than Plaintiff, but as a reward for "towing the line" when he was interviewed in
connection with the swastika incident.  (*Id.* at 23.)  Notably, neither side has presented
any evidence, beyond he-said-he-said, of one candidate being more qualified than the
other.  In light of this absence of evidence, and in light of Plaintiff's assertions of pretext,
I cannot find, as a matter of law, that the Town's failure to promote Plaintiff was not in
retaliation for his harassment complaints.[14]

For the reasons stated above, the Town's Motion for Summary Judgment on
Plaintiff's failure-to-promote-based retaliation claim is denied.

C.    Section 1983 Claims

1.    *Individual Defendants*

---

[14] Plaintiff also argues that the issuance of a written reprimand for his role in the
March 23 Bischoff incident constituted retaliation.  (Pl.'s Opp'n at 25.)  But Plaintiff
provides no legal support indicating that such a reprimand constitutes an adverse
employment action.  In fact, "an employee does not suffer [an adverse employment
action] where the employer merely enforces its preexisting disciplinary policies in a
reasonable manner."  *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  The reprimand
was issued after the Town's investigation into the March 23 incident.  Plaintiff gives the
court no reason to believe that in conducting its investigation into the March 23 incident
and issuing the resulting reprimands the Town was doing anything more than enforcing
its "pre-existing disciplinary procedures."  Plaintiff even admits that his accusation
against Bischoff—which sparked the incident—may have been wrong.  (*See* Pl.'s Opp'n
at 25; Pl.'s Dep. at 70.)

A plaintiff may bring a Section 1983 claim against an individual who has acted, under color of state law, to deprive him of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  In this case, Plaintiff claims that Defendants have deprived him of his right to Equal Protection as guaranteed by the Fourteenth Amendment.  (Complaint ("Compl.") ¶ 22.)  Hostile work environment claims, "brought under the Equal Protection clause, are actionable under § 1983." *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 193 (S.D.N.Y. 2004) (citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143-44 (2d Cir. 1993)).

"[T]he analytical framework of a workplace equal protection claim[] parallels that of a discrimination claim under Title VII."  *Cunningham v. N.Y. State Dep't of Labor*, 326 F. App'x 617, 620 (2d Cir. 2009).  "The elements of one are generally the same as the elements of the other and the two must stand or fall together."  *Feingold*, 366 F.3d at 159.  To succeed against individuals on a Section 1983 claim, however, Plaintiff must also show: (1) the alleged deprivation was by a person (or persons) acting under state law, *see* 42 U.S.C. § 1983; and (2) the individual defendants were personally involved in the alleged deprivation.  *Feingold*, 366 F.3d at 159.

I have already found that Plaintiff has raised a triable issue of fact as to whether he was subject to a hostile work environment under the Title VII standard.  Since the Title VII standard and Section 1983 standard parallel each other, Plaintiff has also raised a triable issue of fact as to whether he was subject to a hostile work environment under Section 1983 as long as the individual defendants were state actors and personally involved in the alleged discriminatory conduct.

If Plaintiff's allegations are true, it is clear that Defendants Curry and Bischoff were personally involved in the alleged hostile work environment.  The remaining individual defendants—Cooper, McMahon, Holopeter, and DiBartolo—are all supervisors in one capacity or another.  In order to find that a supervisor was personally involved in the alleged harassment, Plaintiff must show that the supervisor "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring."  *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001).

Defendants Cooper and McMahon (who Plaintiff does not allege were aware of DiBartolo's alleged threat of retaliation) did not personally participate in the harassment and reacted appropriately when notified of the situation.  With respect to Defendant Holopeter, Plaintiff makes no allegations that he directly participated in the harassment. Plaintiff makes a general allegation that employees "routinely used epithets such as nigger, gook and spic" in the presence of DiBartolo and Holopeter and they failed to do anything about it.  (Pl.'s 56.1 ¶ 39.)  Defendant Holopeter is barely mentioned anywhere else in the complaint, the Rule 56.1 Statements, or Plaintiff's deposition.  One conclusory allegation, without more details specifically pertaining to Defendant Holopeter and not even relating to Plaintiff's religion, is insufficient to establish personal involvement on Holopeter's part in any religion-based harassment of Plaintiff.  Therefore, Defendants Cooper, McMahon, and Holopeter are not liable under Section 1983.

The Court cannot decide as a matter of law that DiBartolo was not personally involved in contributing to the hostile work environment.  Plaintiff has alleged with some specificity that DiBartolo was aware of—if not a participant in—the anti-Semitic behavior of Plaintiff's co-workers but did not act to stop it.  Beyond the allegation that employees "routinely used epithets such as nigger, gook and spic" in the presence of DiBartolo and he failed to do anything about it, (Pl.'s 56.1 ¶ 39), Plaintiff alleges that DiBartolo saw the "Komp Kase Kyle" drawing, (Pl.'s Dep. at 101-02), that Plaintiff informally complained to DiBartolo in early or mid-2006, (*id.* at 122-24), and that again in summer 2006 he asked DiBartolo to "lay off the Jew comments."  (Pl.'s 56.1 ¶ 40; Pl.'s Dep. at 122-24.)  Given these circumstances, the Court finds that the question of whether DiBartolo was "personally involved" the hostile work environment is a question best left to a jury.

Having found that there are issues of fact with respect to whether Defendants Curry, Bischoff, and DiBartolo were personally involved in the harassment, the Court turns to whether these three Defendants were acting under color of state law.  "An official acts under color of state law for Section 1983 purposes when the official exercises a power possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law."  *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (internal quotation marks omitted).  "[M]ere employment by the state does not mean that [an] employee's every act can properly be characterized as state action." *Patterson v. County of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004).  A state actor is liable under Section 1983 when that actor misuses or abuses the power vested in him or her by the state.  *See Hayut*, 352 F.3d at 744.

The Second Circuit has not directly addressed the issue of whether a non-supervisor state employee who has harassed a co-worker is considered a "state actor" for the purpose of Section 1983 liability. *See Patterson*, 375 F.3d at 231 ("we leave this question for further consideration on remand"). District courts in this circuit, and other circuit courts, however, have held that where a co-worker has no supervisory authority over a plaintiff, his harassment is not construed as an action taken under color of state law. *See, e.g.*, *Ottman v. City of Independence*, 341 F.3d 751, 762 (8th Cir. 2003) (sexual harassment by co-worker not state action); *Woodward v. City of Worland*, 977 F.2d 1392, 1400-01 (10th Cir. 1992) (that all alleged harassers were state employees or that "offending acts occurred during work hours is not enough" to establish state action); *Gorton v. Gettel*, No. 04-CV-236, 2007 WL 2154193, at *2 (S.D.N.Y. June 22, 2007) (non-supervisory co-workers' actions deemed "personal pursuit," not state action); *Williams v. City of New York*, No. 99-CV-2697, 2006 WL 2668211, at *27-28 (E.D.N.Y. Sept. 11, 2006) (defendant not acting under color of state law where "harassment in question does not involve use of state authority or position").

Defendants Curry and Bischoff did not have any supervisory authority over Plaintiff in this case. Furthermore, Plaintiff does not allege that their harassment was made possible by the use of any state authority. I agree with the courts cited above that such harassment does not constitute state action. Therefore, Defendants Curry and Bischoff were not acting "under color of state law" and are not liable under Section 1983.

Defendant DiBartolo on the other hand, as a supervisor—more specifically, as the Highway Department Superintendant—was "cloaked" with the authority to prevent harassment and deal with complaints of harassment as they arose. If a jury were to find

that he either participated in the harassment or failed to appropriately respond to Plaintiff's complaints, these actions or omissions would be "under color of state law." Therefore, whether Defendant DiBartolo is liable under Section 1983 is a question of fact.

### 2.  *The Town*

It is well settled that respondeat superior does not apply in Section 1983 cases and that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978).  A government entity is liable under Section 1983 only when the injury is caused by the execution of an official policy or custom.  *Id*.  "With respect to causes of action based on hostile work environments, it is not sufficient for a Section 1983 plaintiff to demonstrate that a supervisor created a hostile work environment.  Rather, a plaintiff must also show that it was the policy or custom of the municipality to maintain a hostile work environment or that the municipality had a policy or custom of deliberate indifference to existence of a hostile work environment."  *Mack v. Port Auth. of N.Y. and N.J.*, 225 F. Supp. 2d 376, 384 (S.D.N.Y. 2002) (citing *Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000)).  The alleged policy or custom "must be so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).

In this case, there is no allegation that maintaining a hostile work environment was an official policy of the Town.  Neither is there any allegation that "senior policymakers" knew or should have known of the hostile work environment prior to

December 2006.[15]  Plaintiff appears to argue that the Town has shown deliberate

indifference to harassment on another occasion, and should therefore be liable.  (*See* Pl.'s

Opp'n at 16.)  Specifically, Plaintiff alleges that the Town did not respond appropriately

to complaints from an African American employee, Niles Curtis, that he was being called

a nigger.  (*See* Pl.'s Opp'n at 15-16.)  It is undisputed, however, that the Town took

action in response to Curtis's complaints by conducting an investigation that included

interviewing the department employees.  (*See* Pl.'s Opp'n at 16; Reply Aff. of

McMahon.)  Plaintiff argues that the investigation was ineffective because DiBartolo—

one of the people who could have called Curtis a nigger—was one of the supervisors

conducting the investigation.  (Pl.'s Opp'n at 16.)  While this aspect of the Town's

investigation may be cause for concern, Curtis refused to specify who used that term,

(McMahon Reply Aff. ¶ 3), and in those circumstances DiBartolo's participation in the

investigation is not sufficient to establish deliberate indifference.  *See, e.g.*, *Zahra v.*

*Town of Southland*, 48 F.3d 674, 685 (2d Cir. 1995) (affirming dismissal where plaintiff

---

[15] If DiBartolo were a "senior policymaker," his alleged knowledge of the
harassment might be enough, under this standard, to defeat summary judgment on
Plaintiff's *Monell* claim.  Plaintiff does not argue that DiBartolo was a "senior
policymaker," but I will address the issue nonetheless.  The determination of who is a
policymaker is a question of law for the court to decide.  *City of St. Louis v. Praprotnik*,
485 U.S. 112, 126 (1988) ("[T]here can be no justification for giving a jury the discretion
to determine which officials are high enough in the government that their actions can be
said to represent a decision of the government itself.").  The record does not point the
Court to a particular official or body that is responsible for setting anti-harassment policy.
Absent evidence to the contrary, the Court can only assume that because it is a "Town"
policy, and not a Highway Department policy, that it was set by Town officials superior
to Defendant DiBartolo.  "When an official's discretionary decisions are constrained by
policies not of that official's making, those policies, rather than the subordinate's
departures from them, are the act of the municipality."  *Id.* at 127.  Therefore, because
DiBartolo is constrained by the Town's anti-harassment policy, his alleged toleration
of—or participation in—harassment does not make him a policymaker for the purpose of
*Monell* liability.

alleged that investigation was disingenuous, but provided no concrete evidence to that effect).

In the absence of a showing that senior policymakers knew of the harassment to which Plaintiff was subjected, or that the Town was deliberately indifferent to harassment on other occasions, Plaintiff has not established that the Town had a policy or custom of discrimination, and his *Monell* claim fails as a matter of law.

     D.     <u>Section 1981 Claim</u>

Plaintiff alleges that Defendants' actions violated his constitutional rights under Section 1981. That statute, however, prohibits discrimination on the basis of race. "Section 1981 does not prohibit discrimination on the basis of . . . religion . . . ." *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citing *Runyon v. McCrary*, 427 U.S. 160, 167 (1976)). Since Plaintiff alleges he was discriminated against because of his religion, not his race, his Section 1981 claims must be dismissed.

     E.     <u>State Law Discrimination Claims</u>

New York State Human Rights Law ("NYSHRL") makes it unlawful for an employer to discriminate on the basis of religion. *See* N.Y. Exec. Law § 296. NYSHRL also states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6). The Second Circuit has found that "this language allow[s] a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 336 F.3d at 158 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)).

In this case, Plaintiff has, at the very least, created a triable issue of fact as to whether Defendants Curry, Bischoff, and DiBartolo "actually participated" in the activity giving rise to the hostile work environment.  At the same time, Plaintiff has failed to show that Defendants Holopeter, McMahon, and Cooper were personally involved in creating the hostile work environment.  Therefore, Plaintiff's NYSHRL claims fail with respect to Defendants Holopeter, McMahon, and Cooper.

With respect to the Town, NYSHRL hostile work environment claims are governed by the same standards as hostile work environment claims under Title VII. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).  Therefore, for the same reasons I have found triable issues of fact with respect to the Town's liability under Title VII, I find triable issues of fact with respect to the Town's liability under NYSHRL.  Accordingly, the Town's motion for summary judgment on that claim is denied.[16]

### III.    Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment dismissing Plaintiff's Section 1981 claims is granted.  Defendants' Motion for Summary Judgment on Plaintiff's Section 1983 claims is granted with respect to Defendants Cooper, McMahon, Holopeter, Curry, Bischoff, and the Town of Yorktown, but denied with respect to Defendant DiBartolo.  The Town's Motion for Summary Judgment on Plaintiff's Title VII discrimination claim is denied.  The Town's Motion for Summary Judgment on Plaintiff's Title VII retaliation claim is granted with respect to Plaintiff's

---

[16] Defendants argue that the NYSHRL claims should be dismissed because Plaintiff did not file a notice of claim.  (Town Mem. at 24.)  Notice of claim requirements, however, do not apply to actions brought under NY Exec. Law § 296.  *See Dortz v. City of New York*, 904 F. Supp. 127, 142 (S.D.N.Y. 1995).

transfer to the Hill, and denied with respect to his transfer to the Parks Department and his failure to be promoted.  The Court also considers Plaintiff's First Amendment retaliation claim withdrawn, and dismisses that claim.  Finally, Defendants' Motion for Summary Judgment on Plaintiff's NYSHRL claims is granted with respect to Defendants Cooper, McMahon, and Holopeter, but denied with respect to Defendants DiBartolo, Curry, Bischoff and the Town of Yorktown.

The Clerk of Court is respectfully requested to terminate the pending motions. (Docs. 32, 50.)  The remaining parties are to appear before the Court for a status conference on July *30*, 2010 at *11:00 AM* .

SO ORDERED.

Dated: July *13*, 2010
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.